1

**BEUS GILBERT MCGRODER** PLLC
ATTORNEYS AT LAW
701 NORTH 44TH STREET
PHOENIX, ARIZONA  85008-6504
TELEPHONE (480) 429-3000

2

3

4

Megan Eshelman Beus/ CA 320017 |
mbeus@beusgilbert.com
K. Reed Willis/(*pro hac vice* forthcoming) |
rwillis@beusgilbert.com

5

6

7

Attorneys for Plaintiffs

8

9

## UNITED STATES DISTRICT COURT

10

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

11

| Gabrielle Rios, an individual; and Truinject Corp., a Delaware corporation, | Case No. _____ |
|---|---|
| | **COMPLAINT** |
| Plaintiffs, | (1) Commission of Trade Secret Misappropriation 18 U.S.C. § 1836; |
| vs. | (2) Cal. Civ. Code § 3426.1; |
| | (3) Computer Fraud 18 U.S.C. § 1030; |
| James J. Peterson, an individual; William A. Carpou, an individual; Kimberly L. Kovacs, an individual; and OCTANe Foundation for Innovation, a Delaware corporation, | (4) Breach of Contract, Breach of Covenant of Good Faith And Fair Dealing, Fraud, Negligent Misrepresentation, Breach of Fiduciary Duty, Aiding and Abetting, Breach of Confidentiality, and Interference with Contractual Relationship Causing Damages |
| Defendants. | |
| | **JURY TRIAL DEMANDED** |

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint(675214.2).docx

# **TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................1

   A.   Gabrielle Rios formed Truinject Corp. to Develop an
        Anatomical Injection Training Device. ...............................................1

   B.   Truinject Hired Kimberly Kovacs to Grow Truinject and
        Kovacs Signed a NDA as Condition of Her Employment ................2

   C.   William Carpou and James "Jimmy P" Peterson Want to
        Invest in Truinject ...............................................................................3

   D.   Peterson Purchased Two Convertible Notes.......................................4

   E.   William Carpou Demands Truinject Become an OCTANe
        Company ...............................................................................................5

   F.   Truinject Repurchases Convertible Promissory Notes from
        James Peterson and William Carpou ...................................................5

   G.   James Peterson Demands Equity After Learning About
        Truinject's Lucrative Lawsuit Against Nestlé Skin Health,
        S.A..........................................................................................................6

   H.   James Peterson Files Suit Without Approval of the Majority
        Holders and After Truinject Notifies Peterson that He is Not
        the Majority Holder...............................................................................7

   I.   Two and Half Years After her Resignation, Kovacs Illegally
        and in Violation of CDAs Obtains Truinject's Confidential
        Information and Shares Truinject's Information with Peterson
        and Reeves .............................................................................................8

II.  PARTIES ....................................................................................................9

   A.   Plaintiff..................................................................................................9

   B.   Defendants .............................................................................................9

III. JURISDICTION AND VENUE................................................................10

IV.  GENERAL ALLEGATIONS....................................................................10

   A.   Background ..........................................................................................10

B.   Gabrielle Rios Sees a Need For Better Injection Training ...............13

C.   Gabrielle Rios Founds Truinject and Develops Valuable
Intellectual Property.........................................................................13

D.   Gabrielle Rios Hires Advisors and Experienced Personnel to
Help Truinject Navigate the Market ..................................................14

E.   Kimberly Kovacs Signs a Non-Disclosure Agreement ...................15

F.   Kimberly Kovacs Signs a Confidentiality Agreement and
Becomes Chief Operating Officer for Truinject ..............................15

G.   Kimberly Kovacs Acted on Behalf of OCTANe and Truinject
Simultaneously ...................................................................................16

H.   William Carpou Becomes Keen on Truinject and Signs Non-
Disclosure Agreement........................................................................17

I.   William Carpou, Without Permission of Truinject and on His
Own Initiative, Generates Note Holder Interest in Truinject ...........19

J.   James Peterson Signs Non-Disclosure Agreement, Purchases
$400,000.00 Convertible Promissory Note and Brings in
Additional Potential Note Holders ....................................................19

K.   Jeffery Reeves Signs Confidential Disclosure Agreement...............20

L.   William Carpou Purchases a Convertible Promissory Note.............21

M.   Kimberly Kovacs Resigns and Downloads Truinject
Confidential Information to Her Personal Account and
Computer.............................................................................................21

N.   Following Kimberly Kovacs Resignation, Gabrielle Rios
Reminded Kovacs of her Confidentiality Obligations......................22

O.   Kimberly Kovacs Uploads Truinject Confidential Material A
Second Time Through Remote Access Two Days After
Resignation.........................................................................................22

P.   Kimberly Kovacs is Confronted About Stealing Confidential
Material and Signs an Exit Declaration Under Penalty of
Perjury Fraudulently Concealing the Extent of Her Subterfuge.......23

iii

COMPLAINT

Complaint(675214.2).docx

Q.    James Peterson Purchases a Second Convertible Promissory Note in the Amount of $450,000.00 and Contributes and Additional $50,000.00 to William Carpou's Note in the December 2016 Tranche, Totaling $1,976,000 Overall for the Tranche ........................................................................................25

R.    William Carpou Demands Truinject Hire OCTANe .......................26

S.    William Carpou and James Peterson Begin to Harass Gabrielle Rios and Sabotage Truinject .................................................27

T.    James Peterson and William Carpou Enter into Note Repurchase Agreements with Truinject ............................................28

U.    James Peterson Pushes for Repayment Following the Repurchase Agreement .....................................................29

V.    James Peterson Learns About the Nestlé Case and Begins Demanding Equity .............................................................30

W.    James Peterson Makes Threats to Interfere With Nestlé Case if He Does Not Get Equity ...................................................30

X.    James Peterson Lacks the Majority Holder Status to File Suit in this Case .......................................................................32

Y.    James Peterson and Jeffery Reeves are Fully Aware that James Peterson Lacks the Majority Holder Status to File Suit in this Case .........................................................................34

Z.    Jeffery Reeves Files Suit Against Truinject on Behalf of James Peterson ....................................................................34

AA.   Jeffery Reeves Files a First Amended Complaint on Behalf of James Peterson that Incorporates Protected Confidential Information ...................................................................35

      1.    Confidential Information from Truinject's Confidential Financial QuickBooks® is Included in the Notice of Motion for Leave to File FAC and FAC ...............................35

      2.    Confidential Information From a Confidential Conversation with William Carpou is Included and Published in the FAC.............................................36

iv
COMPLAINT

BB.   Jeffery Reeves Submits a Declaration that is Based on the Protected Truinject QuickBooks® Illegally Accessed by Kimberly Kovacs .................................................................................... 39

CC.   Gabrielle Rios Learns That Kimberly Kovacs Accessed Truinject Password Protected Programs and Trade Secret Material on 9 July 2019 and 11 July 2019 ....................................... 39

DD.   Truinject Puts Jeffery Reeves and James Peterson On Notice Regarding the Objection to Publication of Trade Secret Material ....................................................................................................... 40

V.   CLAIMS ...................................................................................................... 42

COUNT I         Trade Secret Misappropriation Under the Defend Trade Secret Act (18 U.S.C. § 1836)—Against All Defendants .......... 42

COUNT II        Trade Secret Misappropriation, Cal. Civ. Code § 3426.1 – Against All Defendants ................................................................ 47

COUNT III       Computer Fraud Abuse Act (CFAA) (18 U.S.C. § 1030(a)(2, 4, 5), (g), (e)(6)) - Against Kimberly Kovacs and James Peterson ...................................................................... 52

COUNT IV        Breach of Contract (26 November 2016 and 13 February 2017 Convertible Promissory Notes) – Against James A. Peterson ................................................................................................ 57

COUNT V         Breach of Contract (15 September 2015 NDA) – Against Kimberly Kovacs ................................................................................ 59

COUNT VI        Breach of Contract (25 September 2016 CDA) – Against Kimberly Kovacs ................................................................................ 61

COUNT VII       Breach of Contract (7 October 2016 NDA) – Against William Carpou .............................................................................. 63

COUNT VIII      Breach of Contract (7 October 2016 NDA) – Against OCTANe ........................................................................................... 66

COUNT IX        Breach of Contract Good Faith and Fair Dealings – Against All Defendants ......................................................................... 68

A.   James Peterson .................................................................................. 69

B.   Kimberly Kovacs ........................................................70

C.   William Carpou.........................................................72

D.   OCTANe ..................................................................73

COUNT X   Fraud, Cal. Civ. Code § 1710 – Against Kimberly Kovacs ........74

COUNT XI   Negligent Misrepresentation, Ca. Civ. Code § 1710 –
Against Kimberly Kovacs.............................................76

COUNT XII   Breach of Fiduciary Duty – Against Kimberly Kovacs .............78

COUNT XIII   Aiding and Abetting Breach of Fiduciary Duty – Against
James Peterson ...........................................................81

COUNT XIV   Breach of Confidential Relationship – Against William
Carpou, OCTANe and Kimberly Kovacs....................................82

A.   Truinject Conveyed Confidential Information to Kimberly
Kovacs that Kimberly Kovacs Knew was Disclosed in
Confidence with a Mutual Understanding That the Confidence
be Maintained.........................................................83

B.   Kimberly Kovacs Disclosed the Protected Confidential
Information Conveyed in Confidence with a Mutual
Understanding That the Confidence be Maintained .......................84

C.   Truinject Conveyed Confidential Information to William
Carpou that William Carpou knew was Disclosed in
Confidence with a Mutual Understanding That the Confidence
be Maintained.........................................................85

D.   William Carpou Disclosed the Protected Confidential
Information Conveyed in Confidence with a Mutual
Understanding That the Confidence be Maintained .......................86

E.   William Carpou Acted on Behalf of OCTANe ...............................87

COUNT XV   Interference with a Contractual Relationship – Against
James Peterson ...........................................................88

A.   Interference with Kimberly Kovacs 15 September 2015 Non-
Disclosure and 25 September 2016 Confidential Disclosure
Agreements with Truinject ..............................................89

vi

1

   B.   Interference with William Carpou's 7 October 2016 NDA
        with Truinject ......................................................................... 89

VI.  PRAYER FOR RELIEF .............................................................. 90

VII. JURY DEMAND .......................................................................... 92

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

Complaint(675214.2).docx

# COMPLAINT

For their Complaint, Truinject Corporation and Gabrielle Rios, hereby allege against Defendants James J. Peterson, William A. Carpou, Kimberly L. Kovacs, and OCTANe as follows:

## I. INTRODUCTION

### A. Gabrielle Rios formed Truinject Corp. to Develop an Anatomical Injection Training Device.

1. In 2013, Gabrielle Rios ("Rios") founded Truinject Corporation ("Truinject"), a company that developed an anatomical training device that allowed providers to receive feedback on injection techniques in order to help learn how to inject patients safely and competently. Truinject's signature technology is Facial Injection Training Technology ("FITT"). FITT consists of an injectable simulation technology featuring an anatomical face model, a smart syringe, and a comprehensive analysis software application with built-in 3D facial anatomy, virtual reality anatomical training device, and anatomical tablet training device. It is the first injectable simulation technology featuring true-to-life tissue, 3D digital facial anatomy, and real-time feedback. In order to finance the company, Truinject issued several tranches of convertible promissory notes pursuant to the company's standard Note Purchase Agreement ("NPA") in return for financial investments. Truinject was involved in a number of markets throughout the United States and the world, including with such world-wide companies as Nestlé Skin Health, Merz and Allergan.

2.     Prior to founding Truinject, Rios was a business development manager at Allergan, Inc. ("Allergan").  Rios was new to the medical start-up field and relied on advisors and other professionals experienced in the industry.

**B.     Truinject Hired Kimberly Kovacs to Grow Truinject and Kovacs Signed a NDA as Condition of Her Employment**

3.     Just prior to September 2015, Defendant Kimberly Kovacs ("Kovacs") approached Gabrielle Rios following a Truinject presentation offering her advising services to Truinject. Kovacs informed Rios that she could help Truinject with its initial financing and potential acquisition. Kovacs boasted of her experience helping medical device companies with investment rounds and acquisitions.  Rios was impressed with the image Kovacs portrayed.

4.     On 15 September 2015, Kovacs was hired on by Truinject as a consultant.  Prior to becoming involved with Truinject, she was required to sign a Non-Disclosure Agreement ("NDA").

5.     One year later on 25 September 2016, Kovacs was hired on full-time by Truinject as Chief Operating Officer.  As a condition of her employment she signed a second Confidential Disclosure Agreement ("CDA"). While acting as advisor and Chief Operating Officer at Truinject, Kovacs was simultaneously on the Board of Directors for OCTANe Foundation for Innovation ("OCTANe"). OCTANe is an organization that provides resources and capital for new and upcoming medical technology start-ups.   Kovacs was instrumental in the introduction of many note holders and utilized her network to increase the financial connections to OCTANe.

Complaint(675214.2).docx

6.      Kovacs never disclosed to Rios or Truinject, her relationship with OCTANe. It was not until Kovacs resigned, that Rios learned Kovacs was on the Board of Directors for OCTANe.

**C.      William Carpou and James "Jimmy P" Peterson Want to Invest in Truinject**

7.      Five (5) days after assuming the role of Chief Operating Officer in September 2016, Kovacs reached out to the Chief Executive Officer ("CEO") of OCTANe, William Carpou ("Carpou") to make him aware of Truinject and the technology they were developing.

8.      On or about 25 September 2016, Carpou attended an Allergan Townhall with Allergan's CEO Brent Saunders ("Saunders").  While there Carpou learned Saunders "ha[d] taken an interest"[1] in Truinject.  Carpou's interest in Truinject was peaked and a meeting with Truinject was set up for 7 October 2016.

9.      Following the 7 October 2016 meeting, Carpou began seeking out investors for Truinject and took it upon himself to introduce Rios to yet another OCTANe connection, one of the members of OCTANe's Executive Committee, James Peterson ("Peterson").

10.      Peterson is an "accredited investor" within the meaning of Regulation D promulgated under the Securities Act.  From 2000 to 2018, Peterson was President and CEO of Microsemi, the 4th largest microchip company in Orange County.  In 2018, he sold Microsemi to Microchip for over $10 billion dollars.

---

[1] Email from Bill Carpou to Gabrielle Rios and Jeffery Weinhuff sent on 17 November 2016 at 7:03 AM.

Complaint(675214.2).docx

Peterson's experience in acquisition and technology spans over four decades and Peterson took an immediate interest in both Rios and Truinject.

11.    In turn, Peterson unilaterally initiated actions to bring in additional note holders[2], including Peterson's personal attorney, Jeffery Reeves ("Reeves"). Prior to beginning negotiations with Truinject, Reeves signed a CDA on behalf of himself and his then firm, Gibson Dunn and Crutcher on 6 January 2017 for purposes of potentially becoming a note holder.

12.    While Reeves never ultimately purchased a note, Peterson, Kovacs and Carpou invested their personal funds in the company by purchasing convertible promissory notes.

### D.    Peterson Purchased Two Convertible Notes

13.    In November 2016 and February 2017, Peterson purchased two convertible promissory notes issued by Truinject (the "Notes").    Peterson purchased these Notes as part of two different tranches.  Peterson's initial two (2) investments totaled $850,000.00 or roughly 28% of the August 2015 tranche ($400,000/$1,425,000) and 22.8% of the December 2016 tranche ($450,000/$1,976,000).

---

[2] On 6 January 2017, Peterson invited Steve Litchfield, David Goren, Jim Aralis, Roger Holliday, Bill Carpou, Jeffrey Reeves, Chris Copps, Fabian Battaglia, Phil Sansone and Rick Goerner to Truinject for financing talks and a demonstration of FITT.

14.     As part of his financial funding in the December 2016 tranche, Peterson gifted $50,000.00 to go to Carpou's Promissory Note to compensate him for finding the deal.

**E.     William Carpou Demands Truinject Become an OCTANe Company**

15.     After purchasing a promissory note, Carpou reached out and communicated with Chief Commercial Officer of Allergan, William Meury ("Meury"), on Truinject's behalf, without Truinject's permission or consent.

16.     Following Carpou's discussions with Allergan, in July 2017, Carpou began to request that Truinject officially hire his company, OCTANe, to represent Truinject, requesting "2%-3% warrants of current valuation and a flat $50,000 fee for investor introductions or 3.5% of the capital raised" plus additional fees, [3] including a $10,000.00 monthly payment for services such as legal, financial, regulatory, sales and marketing.  Peterson encouraged Truinject to give in to Carpou's demands. Truinject declined. Thereafter, Carpou and Peterson began to harass Rios making unfair and inappropriate demands. The relationships between Carpou, Peterson and Truinject deteriorated from there.

**F.     Truinject Repurchases Convertible Promissory Notes from James Peterson and William Carpou**

17.     In November of 2017, Truinject remitted to Peterson $200,000.00 under an Amendment to Note Repurchase Agreement, leaving Peterson with an

---

[3] Email from Bill Carpou to Gabrielle Rios sent on 14 July 2017 at 1:38 PM.

Complaint(675214.2).docx

outstanding investment of $664,202.74.  This reduced Peterson's note holdings to roughly 15% of the outstanding debt in the 2016 tranche.

18.    Under the terms of the Note Repurchase Agreement, Carpou was bought out completely.

## G.    James Peterson Demands Equity After Learning About Truinject's Lucrative Lawsuit Against Nestlé Skin Health, S.A.

19.    In October 2018, Truinject sued Nestlé Skin Health for breach of contract, trade secret violations and patent infringement based on Nestlé Skin Health's alleged stealing of Truinject's technology after promising to do a deal with Truinject (the "Nestlé Case").  Rios kept note holders informed of the status of the case, including Peterson.  Updates were given in person, over the phone, via email and text message communications.  Upon receiving notice of the litigation, the Majority Holders in each tranche chose to stand by and allow Truinject to proceed with the Nestlé Case which protected their notes.

20.    In October 2018, after reviewing the Complaint in the Nestlé Case, Peterson saw a chance to extract more than the value of his outstanding balance following the outcome of the suit.  In order to place himself in a more advantageous position with Truinject, Peterson began to pressure Rios to give him equity in Truinject when he was not entitled to any.

21.    Peterson threatened to interfere with the Nestlé Case by initiating litigation, if Truinject did not agree to grant him equity within 48 hours of his demand. When Truinject declined to offer him equity, he filed suit in the Superior Court of the State of California, County of Orange, Central Justice Center.

Complaint(675214.2).docx

**H.** **James Peterson Files Suit Without Approval of the Majority Holders and After Truinject Notifies Peterson that He is Not the Majority Holder**

22.     Under the Notes an "Event Default" includes if "[t]he Company fails to make any payment when due under the Note on the applicable due date," and is controlled by section 5.2, which reads:

> Upon the occurrence of any Event of Default all accrued but unpaid expenses, accrued but unpaid interest, all principal and any act other amounts outstanding under this Note shall . . . (ii) *in the case of any Event of Default* other than under Section 5.1(b) above, become immediately due and payable upon *written notice by or on behalf of Holder to the Company but only if such notice is given with the prior written consent of the Majority Holders.* Notwithstanding any other provision of this Note, or of this Note and the other Financing documents only in concert with all other holders of outstanding Notes as provided in the Financing Documents and *will not take any action, including commencement or prosecution of litigation or any other proceeding to collect this Note, except as agreed by the Majority Holders*.

Emphasis added.

23.     This section was specifically contemplated to protect note holders.

24.     Peterson's Note is less than fifty-one percent (51%) of any tranche that he is part of.  Nonetheless, on 19 April 2019, Peterson filed a Complaint for Breach of Contract (the "Complaint") in order to collect on the Notes without agreement or written consent of the Majority Holders.

25.     On 9 May 2019, following a phone conversation addressing Peterson's lack of Majority Holder status, counsel for Truinject provided Peterson's personal counsel copies of the fully executed Notes that demonstrate

COMPLAINT

that Peterson has less than the required fifty-one percent (51%) of the aggregate principal amount of the outstanding notes for the tranches he purchased notes under.  In addition, Truinject's counsel provided prior case law addressing this same issue. Specifically, Case Number 30-2017-00907629-CU-BC-CJC, *Truinject Medical Corp. vs. Saritasa, LLC*, a case in front of the Honorable Craig Griffin of the Superior Court of California, Orange County.  Judge Griffin ruled on the same issue based on identical language contained in the Notes issued by Truinject, specifically paragraph 5.2 as stated above in full.  Judge Griffin held that Saritasa lacked approval of fifty-one percent of the noteholders before filing suit and dismissed Saritasa's complaint when Saritasa could not get approval from other noteholders.

I. **Two and Half Years After her Resignation, Kovacs Illegally and in Violation of CDAs Obtains Truinject's Confidential Information and Shares Truinject's Information with Peterson and Reeves**

26.     On 9 July 2019 and 11 July 2019, Peterson's colleague at OCTANe and prior Chief Operation Officer for Truinject, Kim Kovacs, without authorization, accessed the password protected Truinject computer system by using unauthorized logins.  A portion of the protected information Kovacs obtained while in the Truinject QuickBooks® accounting was used in the new pleading proffered by Peterson as the Plaintiff's First Amended Complaint ("FAC") and the Motion for Leave to File the First Amended Complaint. (Exhibits 1 and 2).   The information Kovacs accessed is referred to in the FAC as that from a "confidential

8

COMPLAINT

source." Additionally, the claims were padded with confidential information disclosed by Carpou in violation of his NDA.

27.     The FAC was filed on 21 January 2020.

## II.   PARTIES

### A.    Plaintiff

28.     At all times relevant herein, Truinject is a Delaware corporation with its principal place of business in Irvine, California.

### B.    Defendants

29.     James J. Peterson is an individual. At all times relevant herein, James J. Peterson has been an Advisor of OCTANe and a resident of Orange County, California.

30.     William A. Carpou is an individual. On information and belief, at all times relevant herein, William A. Carpou has been the Chief Operating Officer of OCTANe and a resident of Orange County, California.

31.     Kimberly L. Kovacs is an individual. On information and belief, at all times relevant herein, Kimberly L. Kovacs has been a Director of OCTANe and a resident of Orange County, California.

32.     OCTANe is a corporation organized and existing under the laws of the State of Delaware that has its principal place of business in Orange County, California. On information and belief, OCTANe maintains its main offices in Aliso Viejo, California.

Complaint(675214.2).docx

## III.   JURISDICTION AND VENUE

33.     This Court has subject matter jurisdiction over Truinject's Computer Fraud and Abuse Act (CFAA) and Defend Trade Secrets Act (DTSA) claims under 28 U.S.C. § 1331. The Court has subject matter jurisdiction over Truinject's other claims under 28 U.S.C. § 1367(a).

34.     This Court has personal jurisdiction over Defendants James J. Peterson, William A. Carpou, Kimberly L. Kovacs, and OCTANe because these Defendants either: (1) reside in California; (2) own property in California; (3) caused events to occur in this District; or (4) are registered to do business in California.

35.     Venue is appropriate under 28 U.S.C. § 1391 because the individual Defendant's resides in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## IV.   GENERAL ALLEGATIONS

### A.     Background

36.     Kimberly Kovacs joined the OCTANe Board of Directors in May of 2014.  Kovacs graduated from San Diego State University with a Bachelor of Science in Finance. Kovacs has been the Chief Financial Officer for New Media Corporation, Greenland, RosettaNet, ORYXE Energy and Kenzen. She was the Founder and CEO of MyJane Inc. and currently is the CEO of the Arcview Group. She has been managing director for Arroyo Ventures LLC and Golden Seeds, an investment firm focused on investing in early stage women-led companies.  She is also a member of the Board of Directors for Los Angeles Venture Association and

currently sits as president. Kovacs was Chief Operating Officer for Truinject from 22 September 2016 to 10 January 2017. Kovacs remains an active member of the Board of Directors for OCTANe.

37.    William Carpou is Chief Executive Officer of OCTANe.  Carpou graduated from Villanova University in 1976 with a Bachelor of Science in Marketing. Carpou has decades of experience in building and growing technology companies including working with software companies and retail services.  In most recent years Carpou filled the role of Vice President for IKON Office Solutions, Executive Vice President and Partner at Profit Recovery Partners, Executive Vice President at RGIS, and Managing Partner at The Grey Group, before signing on as CEO of OCTANe in March of 2015. Carpou first purchased a Truinject note on 9 January 2017.

38.    James Peterson is a member of the Executive Committee for OCTANe.  From 2011 to 2018, James Peterson was Chief Executive Officer with Microsemi.  During that time, Peterson acquired over 25 different companies which were focused in different aspects of technology. In 2018, Peterson sold Microsemi to Microchip for $10.8 billion dollars.  Currently, he is co-founder of the Peterson Capital Group and recently took 6.4% stake in the internet company Lantronix. Peterson is an "accredited investor" within the meaning of Regulation D promulgated under the Securities Act.  In addition, Peterson remains an investor of OCTANe companies alongside Carpou. Peterson first purchased a Truinject note on 26 November 2016.

Complaint(675214.2).docx

39.    Jeffery Reeves is an attorney with Theodora Oringher, PLLC.  Reeves is personal counsel to Peterson. Reeves worked for Gibson, Dunn & Crutcher for 26 years before departing in December 2017 after he was investigated for sexual harassment of two co-workers[4]. Reeves' current practice at Theodora Oringher is focused on representing companies and individuals in technology, life sciences, and entertainment, including handling high-profile, trade secret misappropriation, defamation, and data breach cases. Reeves has recently represented Peterson in a high-profile defamation action filed against the company that acquired Microsemi in a $10 billion merger that closed in May 2018, seeking upwards of $100 million in damages. Reeves filed the present case on behalf of Peterson in April 2019. Reeves filed the First Amended Complaint on behalf of Peterson on 21 January 2020.

40.    OCTANe is an organization that provides resources and capital for new and upcoming medical technology start-up companies.  In addition, OCTANe offers investment connections, marketing and sales, regulatory and legal services for a fee.  In 2017, OCTANe launched an initiative to transform the organization into a highly focused growth engine. Part of their plan involved lining-up big name companies to partner with, such as Allergan, Medtronic and Experian. Diamond partners such as Allergan earn the right to have a member on the Board of Directors,

---

[4] Randazzo, S. and Hong, N., *At Law Firms, Rainmakers Accused of Harassment Can Switch Jobs With Ease*, The Wall Street Journal (July 30, 2018), https://www.wsj.com/amp/articles/at-law-firms-rainmakers-accused-of-harassment-can-switch-jobs-with-ease-1532965126.

COMPLAINT

Complaint(675214.2).docx

as well as the right to exclusive review of new technology companies participating in OCTANe's program.

41.    Carpou is CEO of OCTANe, Kovacs is on the Board of Directors for OCTANe, and Peterson is a member of OCTANe's Executive Committee.

**B.    Gabrielle Rios Sees a Need For Better Injection Training**

42.    Gabrielle Rios is the founder and Chief Executive Officer of Truinject.

43.    Before founding Truinject, Rios worked at Allergan, where she marketed neurotoxins and dermal fillers to medical providers for cosmetic injections.

44.    In this position, Rios witnessed poorly trained providers injecting patients with neurotoxins and dermal fillers and causing severe harm, including blindness, ptosis and necrosis.   Rios knew people who had suffered from complications from an improper injection, so Rios decided to solve the problem.

**C.    Gabrielle Rios Founds Truinject and Develops Valuable Intellectual Property**

45.    In 2013, Ms. Rios began a start-up company called Truinject. Truinject developed Facial Injection Training Technology ("FITT") that allowed providers to receive feedback on their injection techniques, in order to help providers learn how to inject patients safely and competently.

46.    By March 2013, Truinject had a working prototype of FITT.

47.    Pharmaceutical companies like Nestlé Skin Health (Galderma), Allergan, Merz and others approached Truinject to negotiate agreements for the technology and science.

13
COMPLAINT

**D.    Gabrielle Rios Hires Advisors and Experienced Personnel to Help Truinject Navigate the Market**

48.    Rios was new in the industry, but she understood the value of what Truinject had to offer. Rios was forced to rely on advisors and other professionals experienced in the technology start-up industry in order to successfully navigate the industry and build the business.

49.    In approximately August 2015, following a Truinject demonstration presented by Rios, Kimberly Kovacs approached Rios offering to be a consultant for Truinject.   Kovacs told Rios that she was experienced in financing and acquisition and had recently sold a company for millions of dollars. Kovacs represented that she had extensive experience with buyouts of start-up companies and new emerging businesses.

50.    In September 2015, Kovacs was hired on as a consultant through her then employment with Hardesty, LLC ("Hardesty").  Hardesty is a company that provides growing companies with what they hold out to be, experienced, industry-tested professionals who can step into any situation, add value and create measurable results.

51.    Kovacs' scope of work included:

- Reviewing and revising the Company's current financials, standardizing the Company's financial systems, operations and ensuring GAAP compliance;

- Creating a minimum of 2 financial models for the business for purposes of its fundraising presentations;

- Creating weekly cash flow forecasting;

COMPLAINT

Complaint(675214.2).docx

- Procuring, managing and supporting the Company's financial and business planning needs during the fundraising process, including, without limitation, preparing a "funding plan" to include targets, timing and circles of influence;

- Reviewing and revising the Company's Stock Incentive Plan (in consultation with Company's legal counsel) to ensure compliance; and

- Procuring a 409A or similar valuation for the Company.

**E.**   **Kimberly Kovacs Signs a Non-Disclosure Agreement**

52.   On 15 September 2015, Kovacs signed an NDA in her capacity as a consultant for Truinject. (Exhibit 3).   The agreement remains valid through September 2020.  Specifically, Kovacs agreed,

> (i) to maintain all Confidential information in strict confidence; (ii) not to disclose Confidential Information to any third parties; (iii) not copy or otherwise reproduce Confidential Information in whole or in part; and (iv) not to use Confidential Information for any purpose except for the Business Purpose.

**F.**   **Kimberly Kovacs Signs a Confidentiality Agreement and Becomes Chief Operating Officer for Truinject**

53.   After earning Rios' trust, one year later, on 22 September 2016, Kovacs was made an official offer by Truinject for the position of Chief Operating Officer.

54.   On 25 September 2016, Kovacs signed the offer and was hired on full-time by Truinject as Chief Operating Officer.  As a condition of her employment she signed a second CDA. (Exhibit 4). The CDA acknowledges in part that Kovacs's "employment by the Company creates a relationship of confidence and trust with respect to any information or materials of a confidential or secret nature

15

Complaint(675214.2).docx

that may be made, created or discovered by me or that may be disclosed to me by the Company.…"  Moreover, the agreement includes a clause stating:

> At all times, both during my employment and after its termination, ***I will keep and hold all Proprietary Information in strict confidence and trust***. I will not use or disclose Proprietary Information without the prior written consent of the Company in each instance.… ***Upon termination of my employment with the Company***, I will promptly deliver to the Company all documents and materials of any nature pertaining to my work with the Company, ***and I will not take with me or retain in any form any documents or materials or copies containing any Proprietary Information***.

Emphasis added.

55. "Proprietary Information" is defined in Section 8 of the CDA as,

> [A]ny information or materials of a confidential or secret nature that may be made, created or discovered by me or that may be disclosed to me by the Company or a third party in relation to the business of the Company or to the business of any parent,, subsidiary, affiliate, customer or supplier of the Company, or any other party with whom the Company agrees to hold such information or materials in confidence.

**G.   Kimberly Kovacs Acted on Behalf of OCTANe and Truinject Simultaneously**

56. While acting in her role as Chief Operating Officer for Truinject, Kovacs reached out to William Carpou, the CEO of OCTANe, to inform him about Truinject's meetings with Allergan and the interest from other big Pharma Companies.

**H.    William Carpou Becomes Keen on Truinject and Signs Non-Disclosure Agreement**

57.    OCTANe and Allergan have a symbiotic relationship based on the nature of their respective businesses.  OCTANe searches out new and upcoming medical technology start-ups and Allergan buys them out. When Allergan buys out an OCTANe company, OCTANe profits.

58.    Based on his role as CEO of OCTANe, Carpou, attended an Allergan Townhall on or about 25 September 2016, with Allergan's CEO, Brent Saunders. While there Carpou had a conversation with Saunders regarding Saunders' recent meeting with Truinject. Carpou learned Saunders "ha[d] taken an interest"[5] in Truinject.

59.    Based on his role in the industry and his work with Allergan, Carpou was aware that Allergan was on a "Buying Spree"[6], buying up a number of new medical start-ups.

60.    This spurred Carpou's own interest in Truinject and a meeting between Carpou and Truinject was held on 7 October 2016 at Carpou's invitation.

61.    Prior to the meeting, Carpou personally signed an NDA on behalf of OCTANe on 7 October 2016. (Exhibit 5). The agreement remains valid through October 2021.  Specifically, Carpou agreed,

---

[5] Email from Bill Carpou to Gabrielle Rios and Jeffery Weinhuff,17 Nov,16, 7:03 AM.

[6]    https://www.the-scientist.com/the-nutshell/allergans-buying-spree-rolls-on-32821

COMPLAINT
Complaint(675214.2).docx

1
2
3
4
5

(i) to maintain all Confidential information in strict confidence; (ii) not to disclose Confidential Information to any third parties; (iii) not copy or otherwise reproduce Confidential Information in whole or in part; and (iv) not to use Confidential Information for any purpose except for the Business Purpose.

6
7
8

62.     Pursuant to the 7 October 2016 NDA, "Business Purpose" is the "Company and [OCTANe] desire to begin discussions regarding a business opportunity of mutual interest."

9
10
11
12
13
14
15
16
17
18
19
20



21
22
23
24
25

Above: (left) Bill Carpou tests out the working FITT model on 7 October 2016; (center) Bill Carpou, James Peterson and others attend presentation of FITT on 22 November 2016; (right) Bill Carpou and Gabi Rios during 22 November 2016 presentation at Truinject offices.

26
27
28

Complaint(675214.2).docx

**I.**      **William Carpou, Without Permission of Truinject and on His Own Initiative, Generates Note Holder Interest in Truinject**

63.      Carpou was impressed following the 7 October 2016 meeting and on 20 November 2016, Carpou took it upon himself to introduce Rios to a potential note holder and one of the members of OCTANe's Executive Committee, CEO of Microsemi Corporation, James Peterson.   In telling Peterson about Truinject, Carpou was acting in his own capacity and without authority from Truinject, especially given Carpou's CDA that prevented him from disclosing confidential information about Truinject.

**J.**      **James Peterson Signs Non-Disclosure Agreement, Purchases $400,000.00 Convertible Promissory Note and Brings in Additional Potential Note Holders**

64.      On 22 November 2017, Peterson, as CEO of Microsemi, directed the Executive Vice President and Chief Strategy Officer, Steve Litchfield to sign a CDA on behalf of Microsemi, prior to meeting with Truinject to review FITT and discuss potentially purchasing a note.

65.      On 26 November of 2016, Peterson purchased a Convertible Promissory Note for $400,000.00 as part of the August 2015 tranche.  The August 2015 tranche is made up of $1,425,000 in overall notes. (Exhibit 6).

66.      Following his purchase of a note in the August 2015 tranche, Peterson, on his own initiative and without authorization from Truinject, reached out to Reeves on 24 December 2016, stating "When you get a chance look at a company named Truinject… they have a couple of youtubes and a nice webpage… I just put

some money to work there… that being said they look like a target for Allergan take out!  Litchfield who never invests took a piece?! Carpou found the deal".

### K.  **Jeffery Reeves Signs Confidential Disclosure Agreement**

67.    On 6 January 2017 Reeves signed a CDA purportedly on behalf of his then law firm, Gibson Dunn and Crutcher.  Reeves was and is the personal attorney for Peterson. Reeves expressed interest in purchasing a Truinject note and signed the CDA.  (Exhibit 7).



Above: James Peterson, Jeffery Reeves and others, attend a presentation of the working FITT model on 6 January 2017 at Truinject offices.

68.    Peterson[7] and Carpou both stated that Reeves was a "high-maintenance" investor, recommending that Truinject not accept his money because Reeves was difficult, and his purchase of a note never ended up coming to fruition.

---

[7] Email from Gabrielle Rios to William Carpou, 15 Jan 17, 7:35 PM.

L.    **William Carpou Purchases a Convertible Promissory Note**

69.    On 9 January 2017, Carpou purchased a $50,000.00 convertible promissory note issued by Truinject as part of the December 2016 tranche.  The December 2016 tranche was made up of $1,976,000 in overall notes, at that time.

M.    **Kimberly Kovacs Resigns and Downloads Truinject Confidential Information to Her Personal Account and Computer**

70.    On 10 January 2017, Kovacs had an employee review with Rios. During the meeting, Kovacs requested access to confidential Truinject documents. Kovacs argued that Rios did not fully trust her because she did not have unlimited access to Truinject protected documents.

71.    Believing that Kovacs was fully committed to Truinject after having just received a bonus and in reliance on Kovacs' promises of confidentiality, Rios granted the request to show Kovacs that she was a trusted employee, and Kovacs was given full access. Kovacs resigned the same day. This was approximately four months after her hire date and mere hours after given full access to all Truinject corporate files.  Her resignation was "effective immediately."

72.    Given her sudden departure, Rios looked into the document access that she had granted Kovacs just prior to her resignation.  Rios learned that Kovacs had uploaded every single corporate file Truinject possessed to her own personal Google files prior to her departure.  Many of Truinject's corporate files were Confidential Information under the CDA.

73.    After discovering the download, at 8:44 PM on 10 January 2017, Rios disabled Kovacs's access to Truinject's system and any of their supporting

1 programs.  At the time, Rios remained unaware that Kovacs had created more than
2 one access method to enter the system.

### N. Following Kimberly Kovacs Resignation, Gabrielle Rios Reminded Kovacs of her Confidentiality Obligations

74.    On 11 January 2017, Rios emailed Kovacs accepting her resignation the day prior and reminding Kovacs that her "confidentiality obligation to Truinject… continue following this separation."[8]

### O. Kimberly Kovacs Uploads Truinject Confidential Material A Second Time Through Remote Access Two Days After Resignation

75.    A search of Truinject's system two days later revealed that on 12 January 2017, Kovacs once again accessed the system and downloaded additional items to her personal email at klk92629@gmail.com.  This address was never given access to Truinject's documents by Truinject and, on information and belief, Kovacs added her personal email address to Truinject's computer privilege log.

76.    The 12 January 2017 download included schematics for design, legal and strategic roadmaps for product rollout, vendor lists, schedules of assets, financial models, accounting and noteholder analysis, capitalization tables ("CAP Tables"), and a document including all of Truinject's logins and passwords.

---

[8] Email from Gabrielle Rios to Kimberly Kovacs, 11 Jan17.

Complaint(675214.2).docx

1
2
3
4
5
6



7
8
9
10
11
12
13
14
15
16
17
18
19
20



21    77.    Rios informed Truinject's Corporate Counsel at the time, Simon

22  Inman ("Inman") at Carle Mackie Power and Ross, about Kovacs's actions.

23        **P.    Kimberly Kovacs is Confronted About Stealing Confidential**
24            **Material and Signs an Exit Declaration Under Penalty of Perjury**
25            **Fraudulently Concealing the Extent of Her Subterfuge**

26    78.    In February 2017, Inman contacted Kovacs regarding the 12 January

27  2017 upload of Truinject's confidential documents to her personal Gmail account

28

and any other documents she still had in her possession. Kovacs denied having downloaded any documents saying it was merely a sync to confirm she had no files.

79.   Inman informed her that the documents were not synced, but rather separately downloaded to her private Gmail account and based on that he asked Kovacs to delete the documents and sign and date an Exit Declaration.

80.   On or about 15 February 2017, Kovacs admitted to the 12 January download and signed the Exit Declaration "under penalty of perjury under the laws of the State of California…," swearing:

> I hereby confirm that ***I have deleted from any computer to which I may have access***, directly or indirectly, ***any and all confidential files and information belonging to Truinject to which I may have had access during or after my employment with Truinject, and that none of such files or information is any longer accessible, directly or indirectly, by me***, whether in electronic or hard copy form. This includes, but is not limited to, the files that were saved to my hard drive during my employment and per the request of Truinject were uploaded to a Google Drive folder on January 12, 2017 and then subsequently deleted, as were all files on my personal computer related to any work product during my employment period. These files were deleted upon the request of Truinject and after confirmation that Truinject had received these files. ***I confirm that I have complied with my obligations of confidentiality to Truinject and will continue to do so.***

Emphasis added. (Exhibit 8).

81.   Truinject believed the matter to be resolved.

82.   However, because Truinject was raising money in the December tranche at the time, Rios informed all note holders, including Peterson and Carpou, of Kovacs' resignation and downloading of the Truinject's protected documents in

24

order to allow the potential noteholders, including Peterson and Carpou, the opportunity to change their mind regarding any additional note purchases.

83.     Carpou informed Rios that he previously had unrelated concerns with Kovacs and that he was already considering removing Kovacs from the OCTANe Board of Directors. Carpou told Rios that she should not worry about Kovacs' download of Truinject's corporate documents.

84.     In a separate conversation, after informing Peterson about the details of Kovacs' subterfuge, Peterson told Rios not to worry about Kovacs' taking Truinject documents and that if necessary, they would simply "buyout Kovacs' note".

85.     Carpou and Peterson chose to proceed with purchasing Truinject's notes.

86.     Moreover, notwithstanding his concerns about Kovacs and now having the knowledge that she had taken possession of all of Truinject's documents, Carpou kept Kovacs on the Board of Directors.

Q.     **James Peterson Purchases a Second Convertible Promissory Note in the Amount of $450,000.00 and Contributes and Additional $50,000.00 to William Carpou's Note in the December 2016 Tranche, Totaling $1,976,000 Overall for the Tranche**

87.     Peterson again reached out to Truinject. On 21 December 2016, Peterson contacted Rios asking if Truinject allowed current note holders a first right of refusal for future investments.

88.     On 13 February 2017, Peterson purchased an additional convertible promissory note in the amount of $450,000.00 issued by Truinject as part of the

December 2016 tranche. The December 2016 tranche totaled $1,976,000, making Peterson's February 2017 Note 22.8% of the tranche. (Exhibit 9).

89.     On 13 February 2017, Peterson included an additional $50,000.00 in funding to be applied on behalf of Carpou for finding the deal. The original Carpou Note was adjusted to reflect an original note of $100,000.00, as part of the December 2016 tranche.

90.     Petersons' two (2) notes totaled $850,000.00 out of a total of $5,263,500 or approximately 16% of outstanding notes.

**R.     William Carpou Demands Truinject Hire OCTANe**

91.     In July 2017, Carpou began to demand that Truinject officially hire his company, OCTANe, requesting "2%-3% warrants of current valuation and a flat $50,000 fee for investor introductions or 3.5% of the capital raised" plus additional fees[9], including a $10,000.00 monthly payment for services such as legal, financial, regulatory, sales and marketing.

92.     Carpou requested that Rios inform Allergan, that Truinject was an OCTANe company. Rios declined to do so stating that it would be untrue and dishonest.

93.     Truinject declined OCTANe representation.

94.     Carpou made it clear that he was disappointed that Truinject was not offering compensation to OCTANe.

_____

[9] Email from Bill Carpou to Gabrielle Rios, 14 Jul17, 1:38 PM.

Complaint(675214.2).docx

**S.** **William Carpou and James Peterson Begin to Harass Gabrielle Rios and Sabotage Truinject**

95.     Despite not representing Truinject in any capacity, in early-mid 2017, Carpou informed Rios that he initiated communications with William Meury, Chief Commercial Officer of Allergan regarding Truinject.   Based on his role at OCTANe, he held himself out as if he had the authority to do so.

96.     On 19 July 2017, Rios wrote to both Peterson and Carpou regarding the alleged conversation with Meury stating, "I was completely surprised as to how a conversation with Meury went as far as him placing a value on Truinject and sharing this with you….  Any conversation that goes into that kind of extent should be something Truinject is conducting."[10]

97.     After Rios informed Carpou that he never had authority to speak for Truinject, Carpou and Peterson began making personal insults towards Rios and demanding updates and information to which they were not entitled.

98.     Carpou and Peterson would harass Rios if she did not provide an immediate response, sending multiple texts and emails to both Rios and Truinject's Corporate Counsel.  Rios made every effort to keep-up with their demands, sending over 150 emails regarding the status of the company and the work being put forth into growing Truinject.  Rios went so far as to answer late night personal questions posed by Peterson such as "tell me one wish"[11] and "who hugs u"[12].

---

[10] Email from Gabrielle Rios to Bill Carpou, 18 Jul,17, 11:49 PM.

[11] Text message from Peterson to Gabrielle Rios, 16 Jan 17.

[12] Text message from Peterson to Gabrielle Rios, 16 Jan 17.

99.    Unable to keep up with Peterson and Carpou's demands, in October 2017, Rios reached out to Truinject's then Corporate Counsel, Chris Shoff ("Shoff") with Latham & Watkins, LLP.  Shoff informed both Peterson and Carpou that because they were not shareholders, they were not entitled to updates.

100.    Peterson attempted to drive up Truinject's legal fees, sending Shoff constant emails, calling, cursing at Shoff during conference calls, and even going so far as to go over Shoff's head and reach out to other, more senior attorneys in the firm, including one of the founders in London.

101.    Peterson's tactics of running up legal fees caused Truinject to be unable to afford the services Latham & Watkins, LLP resulting in damages to Truinject and the loss of Latham & Watkins, LLP as corporate counsel representation for Truinject.

102.    In order to put an end to the harassment from Peterson and Carpou, Truinject offered to repurchase the Notes purchased by both Peterson and Carpou, prior to their maturity date.

**T.    James Peterson and William Carpou Enter into Note Repurchase Agreements with Truinject**

103.    On or about 17 October 2017, Peterson entered into a Note Repurchase Agreement, whereby Truinject agreed to remit to Peterson $200,000.00 under an Amendment to Note Repurchase Agreement, leaving Peterson with outstanding notes in the amount of $664,202.74.

104.    Under the Note Repurchase Agreement Section 5(c) between Peterson and Truinject, the parties agreed, "[n]othing in this Agreement…. shall release, modify discharge or otherwise apply to the… obligations, rights, duties and

28

Complaint(675214.2).docx

provisions of the November 22, 2016 Confidential Disclosure Agreement attached hereto as Exhibit C…"

105.   The $200,000.00 was distributed to Peterson via a wire transfer directly to his personal account.

106.   On or about 17 October 2017, Carpou also entered into a Note Repurchase Agreement and was bought out completely, with a full repayment of $103,134.25.

107.   Under the Note Repurchase Agreement Section 5(c) between Carpou and Truinject, the parties agreed, "[n]othing in this Agreement…. shall release, modify discharge or otherwise apply to the… obligations, rights, duties and provisions of the October 7, 2016 Non-Disclosure Agreement attached hereto as Exhibit C…"

**U.**   **James Peterson Pushes for Repayment Following the Repurchase Agreement**

108.   In October 2018, Truinject sued Nestlé Skin Health and its subsidiaries for trade secret misappropriation, patent infringement and breach of contract.  The case is currently pending in the District Court for the District of Delaware.

109.   Rios informed Peterson of the impending litigation on 3 May 2018.

110.   Peterson continued to push for repayment of his remaining notes through text messages and emails to Rios, and going so far as email corporate counsel demanding re-payment. This continued up until 15 October 2018.

### V.   James Peterson Learns About the Nestlé Case and Begins Demanding Equity

111.   On 15 October 2018, Reeves, emailed Peterson a copy of the complaint filed by Truinject against Nestlé Skin Health.

112.   Peterson forwarded the article to Rios and others stating, "Investors can become supporters or nightmares at a time like this !"[13]

113.   Peterson then involved additional note holders by forwarding the email to a number of note holders, current counsel for Truinject and unrelated third parties, stating, "Gabi needs to communicate with investors ! We can help or hurt her chances of winning".[14]

114.   Following an in-depth review of the complaint in the pending Nestlé Skin Health Case, Peterson recognized the substantial lawsuit and suddenly began demanding equity rather than repayment, sending numerous texts and emails.

### W.   James Peterson Makes Threats to Interfere With Nestlé Case if He Does Not Get Equity

115.   Peterson threatened to use his ability to inflict substantial financial and reputational harm through baseless lawsuits as a threat if his demands were not met. On 9 Mar 2019, Peterson contacted Truinject's counsel directly via email stating:

> It's amazing but here I am again regarding Tru Inject ! I just spoke to Gabi ... my investment documents converted in July to ownership ! I have seen no such documents and now Gabi claims that she spoke to 98%

---

[13] Email from James Peterson to Gabrielle Rios, Herbert Kozlov, Steve Litchfield, David Goren and William Carpou, 15 Oct,18, 11:45 AM.

[14] Email from James Peterson to Herbert Kozlov, Amy Litchfield, Steve Litchfield, David Goren and William Carpou, 15 Oct 18, 12:14 PM.

COMPLAINT

of her investors who agree to wait for closure of current legal action ! That totally impossible and untrue ! ***If you are still involved please follow thru with my conversion... I would like a response by COB Wednesday or I will authorize legal action and place my claim to the short and drag Nestlé into this***

Emphasis added.

116.   Rios reminded him he was not entitled to equity under the terms of the agreement until a Series A financing round had occurred. Peterson responded, again ignoring the plain language of the agreement, "I understand the situation but I care less of how many investors ! I want my original documents honored ! I want my % of ownership"

117.   Peterson continued to harass Rios, threatening to include Nestlé Skin Health in his actions stating, "Please have your legal team draft or I can easily have mine draft ***and send to you and Nestlé*** …"  (Emphasis added.)  All despite having no right to equity.

118.   Peterson texted Rios constantly at all hours of the night, harassing her and sending her demands.

119.   Peterson used his personal attorney, Reeves, as a method of inflicting harm and threatening pending litigation in the Nestlé Case. On 9 March 2019, Peterson texted Rios stating, "My legal team can easily interfere with your settlement to protect my Trust and % of ownership !"

120.   On 25 March 2019, Peterson began emailing Truinject's counsel in the Nestlé case directly. The emails began on 25 March 2019 at 7:08 PM and included Leo Beus, Herbert Koslov (Truinject counsel), Gabrielle Rios, Jeffery

Reeves, Steven Litchfield, Bill Carpou, additional current note holders and others. They continued in rapid fire succession being sent at 7:10 PM, 8:07 PM, 8:17 PM, then on 26 March 2019 continuing at 5:53 AM, 7:54 AM, 8:02 AM, 11:38 AM, and 12:48 PM, issuing various threats, including "this time price of poker is higher with the Nestlé litigation ... never the less my note was due July 2018 and must be converted to equity ... game on!"

121.   The current note holders who had been included on the email chain were upset and contacted Rios directly, expressing concerns over Peterson's claims.

122.   On 8 April 2019, Reeves sent a demand letter purported to be "written notice" pursuant Section 5.2 of the terms of the Convertible Promissory Note on behalf of Peterson, demanding $950,000.00.  The letter stated that if Truinject did not immediately pay that amount in full, Peterson would only accept equity in Truinject, regardless of the fact he had no right to equity.

123.   The demand for nearly one million dollars was in excess of almost $300,000.00 what Peterson was legally owed under the note.  The amount was intended to be beyond the available funds Peterson believed Truinject had at its disposal. On the date of that letter, 8 April 2019, Peterson's approximate note value was $664,202.74.

X.   **James Peterson Lacks the Majority Holder Status to File Suit in this Case**

124.   The written notice was from Peterson alone. No other note holders were included. Peterson's Note is less than fifty-one percent (51%) of any tranche that he is part of.

125.   On information and belief, Peterson reached out to other note holders asking them to participate in the demand and in filing suit. They declined.

126.   Under the Notes an "Event Default" includes if "[t]he Company fails to make any payment when due under the Note on the applicable due date," and is controlled by section 5.2, which reads:

> Upon the occurrence of any Event of Default all accrued but unpaid expenses, accrued but unpaid interest, all principal and any act other amounts outstanding under this Note shall . . . (ii) ***in the case of any Event of Default*** other than under Section 5.1(b) above, become immediately due and payable upon ***written notice by or on behalf of Holder to the Company but only if such notice is given with the prior written consent of the Majority Holders.*** Notwithstanding any other provision of this Note, or of this Note and the other Financing documents only in concert with all other holders of outstanding Notes as provided in the Financing Documents and ***will not take any action, including commencement or prosecution of litigation or any other proceeding to collect this Note, except as agreed by the Majority Holders***.

Emphasis added.

127.   Peterson currently owns approximately 28% of the outstanding debt in the 2015 tranche and 15% of the outstanding debt in the 2016 tranche.

128.   Pursuant to Section 6.9 of the NPA Majority Holders is defined as "the holders of Notes representing at least a majority of the aggregate principal amount of the Notes then outstanding."

129.   At no time has Peterson received consent from the Majority Holders to demand repayment under Section 5.2.

**Y.   James Peterson and Jeffery Reeves are Fully Aware that James Peterson Lacks the Majority Holder Status to File Suit in this Case**

130.   Rios had previously pointed out to Peterson the Majority Holder Provision of the Notes. Peterson was aware that he did not have the necessary Majority Holder status to file suit. Peterson stated in a text message, "I understand the situation but I care less of how many investors!"

131.   Peterson has less than the required fifty-one percent (51%) of the aggregate principal amount of the outstanding notes and nonetheless commenced litigation to collect on the Notes without agreement of the Majority Holders.

132.   On 9 May 2019, following a phone conversation addressing Peterson's lack of Majority Holder status, counsel for Truinject provided Peterson's legal team copies of the fully executed Notes that demonstrate that Peterson had less than the required fifty-one percent (51%) of the aggregate principal amount of the outstanding notes for the tranches he purchased notes under.  In addition, Truinject's Counsel provided prior case law addressing this exact issue with the exact language that was adjudicated in the Orange County Superior Court.

**Z.   Jeffery Reeves Files Suit Against Truinject on Behalf of James Peterson**

133.   On 19 April 2019, Reeves, on behalf of Peterson filed a Complaint for Breach of Contract in order to collect on Notes with interest.

Complaint(675214.2).docx

134.   Reeves had previously made it clear, on an email to Peterson dated 25 March 2019, that, "it is almost always better to be the plaintiff."   Peterson then forwarded this email to a number of individuals including counsel for Truinject.

135.   The complaint was filed by Peterson, as an individual, and without the consent of the Majority Holders.

**AA.   Jeffery Reeves Files a First Amended Complaint on Behalf of James Peterson that Incorporates Protected Confidential Information**

136.   On 30 August 2019, Jeffery Reeves, informed Truinject attorneys that he would be filing a First Amended Complaint ("FAC") given Truinject's refusal to pay his client or offer equity for the remaining debt.

137.   The FAC was filed not under seal and in a public forum.

**1.   Confidential Information from Truinject's Confidential Financial QuickBooks® is Included in the Notice of Motion for Leave to File FAC and FAC**

138.   The Notice of Motion for Leave to File FAC filed by Reeves, alleges that on or about 11 July 2019, Peterson learned through confidential sources, that Rios allegedly made an improper use of funds.   The FAC refers to Truinject Trade Secret Information that is mischaracterized and improperly applied to include, company dinners with note holders and industry professionals, business trips which required Rios to transport necessary equipment associated with FITT and a vehicle used to transport technology and equipment.

139.   The Notice of Motion for Leave to File FAC mischaracterized Truinject's protected and confidential QuickBooks® information as its *basis* to file an FAC. Falsely alleging:

On or about July 11, 2019—two months after filing his Complaint—Peterson discovered information concerning Rios's spending of company funds. (Reeves Decl., ¶ 3.) As explained in the concurrently filed Proposed First Amended Complaint, in the weeks following Truinject's receipt of funds from the 2016 Note, Rios drastically increased her spending of company funds which were unrelated to the development of Truinject's technology of business. (FAC, ¶ 31.)[15]

140.    Paragraphs 31-33 of the FAC, disclosed Trade Secret Protected Truinject financial information contained in Truinject's financial QuickBooks®.

> ## 2.    Confidential Information From a Confidential Conversation with William Carpou is Included and Published in the FAC

141.    On 12 January 2017 and under the protection of a CDA, Rios and Carpou had a confidential discussion about the minimum amount Truinject would accept, which reflects negotiation strategy, should Truinject receive an offer. Truinject never received an offer.  The numbers discussed were contemplations of what Truinject would consider a good first offer, should an offer be made.

142.    Following that confidential discussion, Carpou emailed Rios acknowledging the nature of what was discussed stating "$150m is a good first offer…….(yes, I know confidential)."[16]  To confirm that the information was not to be shared, Rios responded by reiterating that the numbers discussed were "super

---

[15] Notice of Motion for Leave to File First Amended Complaint Page 8 lines 8-12

[16] Email sent by Bill Carpou to Gabrielle Rios, 12 Jan 17, 3:41 PM, subject Re: Lynn Salo.

confidential."[17]   The subject of the email containing the confidential information was titled "Re: Lynn Salo".

143.   During the 25 March through 26 March 2019 firestorm of emails from Peterson to various legal representatives and note holders, of which Carpou was copied, Carpou emailed Rios and Truinject's counsel on 26 March 2019, stating "I am no longer involved with Truinject as an investor or interested party. Please remove me from all emails at this point.   My organization was involved in representing Truinject to investors but at this point am far removed and prefer not to get involved."

144.   Despite claiming that he preferred "not to get involved," Carpou, in violation of his CDA, then forwarded and published the confidential information contained in the "Re: Lynn Salo" email to other note holders, including Peterson, Reeves and Kovacs.

145.   Between 25 March 2019 and 27 March 2019, the confidential "Re: Lynn Salo" email was opened, published and shared by Carpou 3 times, including with persons in Costa Mesa, California, Laguna Hills, California and San Clemente, California.

146.   Reeves's Orange County Office is located in Costa Mesa, California.

147.   On information and belief, Petersons residence is in the zip code, 92674 identified as San Clemente, California.

_____

[17] Email sent by Gabrielle Rios to Bill Carpou, 12 Jan 17, 3:54 PM.

COMPLAINT

148.   On information and belief, Kovacs residence is in the zip code 92677 identified as Laguna Hills, California.

149.   All Truinject emails sent by Rios include a confidentiality notice, stating:

> This email may contain confidential proprietary and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or unauthorized disclosure by others is strictly prohibited.  If you are not the intended recipient (or authorized to receive this from the recipient), please contact the sender by reply email and delete all copies of this message.

150.   The FAC filed on behalf of Peterson contains the information in the "Re: Lynn Salo" email falsely alleging, "To keep her investors happy, and to promote further infusions of cash, on January 12, 2017, Rios wrote to Carpou stating that Allergan had made an offer to acquire Truinject for at least $150,000,000. Rios intended Carpou to relay this information to other investors, including [Peterson].[18]"

151.   But Peterson misrepresented and misstated the email.  Rios never said that Allergan made an offer to Truinject for $150,000,000.   Truinject never received an offer from Allergan.  The numbers discussed were contemplations of what Truinject would consider a good first offer, should an offer be made.

---

[18] Paragraph 28 of the First Amended Complaint filed on 21 January 2020 on behalf of James Peterson.

COMPLAINT

**BB.** **Jeffery Reeves Submits a Declaration that is Based on the Protected Truinject QuickBooks® Illegally Accessed by Kimberly Kovacs**

152.   As part of the pleading, Reeves submitted a Declaration stating, "The facts giving rise to the amended allegations were discovered on or about July 11, 2019 after my office discovered information concerning Rios's spending of company funds on herself." He did so under penalty of perjury under the laws of the State of California.

153.   The facts referenced are protected trade secret information regarding finances, funding and corporate strategy from protected Truinject QuickBooks® Accounting.

**CC.** **Gabrielle Rios Learns That Kimberly Kovacs Accessed Truinject Password Protected Programs and Trade Secret Material on 9 July 2019 and 11 July 2019**

154.   Not understanding how protected trade secret information was included in the FAC, Truinject began to investigate. Using the date provided by Peterson's FAC and Reeves's Declaration, Rios reviewed Truinject logins. On 9 July 2019 and 11 July 2019, without authorization or permission, Kovacs logged in to Truinject's password protected financial QuickBooks® account containing trade secrets for Truinject.[19]

---

[19] Screen shots documenting the unauthorized access and login of Kim Kovacs on 9 July 2019 and 11 July 2019, a confidentiality agreement signed by Kim Kovacs dated 25 September 2016, an Exit Declaration swearing she no longer had access or the ability to access Truinject's confidential information, the Declaration of Jeffery Reeves and the information contained in First Amended Complaint filed by

Above: Captured screen images of the Truinject QuickBooks® logs showing Kim Kovacs' access on 9 July 2019 at 6:44 am and 11 July 2019 at 8:30 pm.

155.   On both dates the Truinject system was breached, Kovacs was on the Board of Directors at OCTANe, Peterson was on the Executive Committee at OCTANe, and Carpou was CEO of OCTANe.

DD.   **Truinject Puts Jeffery Reeves and James Peterson On Notice Regarding the Objection to Publication of Trade Secret Material**

156.   On 30 August 2019, Reeves sent counsel for Truinject a copy of the FAC.

157.   On 16 September 2019, Reeves and counsel for Truinject held a meet and confer regarding Truinject's objection to filing the FAC.

_____

Peterson has been turned over to Federal Law Enforcement  (specifically the Los Angeles office of Federal Bureau of Investigation) officials.

40

COMPLAINT

158.   Counsel for Truinject, Leo Beus and Reed Willis, informed Reeves that the FAC contained Truinject trade secret information and confidential information and that as such, Truinject would not agree to its filing or publishing.

159.   Counsel for Truinject, Leo Beus and Reed Willis, informed Reeves that the FAC should be filed under seal.

160.   On 4 October 2019, Reeves filed the Notice of Motion for Leave to File FAC and FAC. Neither documents were filed under seal.

161.   On 8 November 2019, Truinject filed an opposition to Peterson's Motion to Amend, stating in part, "On 9 July 2019 and 11 July 2019, Peterson's colleague at OCTANe Enterprise Services ('OCTANe'), Kim Kovacs ('Kovacs'), a former Truinject employee, broke into the protected Truinject computer system in violation of state and federal laws.   A portion of the protected information Kovacs stole was used in the new pleading proffered by Peterson as the Plaintiff's [Proposed] First Amended Complaint ('Proposed FAC')."

162.   Truinject elected to oppose Peterson's Motion for Leave to File First Amended Complaint, based on the inclusion of information that was illegally obtained from a password protected system and the publication of confidential and trade secret protected information.

163.   Since its filing, Truinject has been forced to legally defend against its own stolen trade secrets resulting in damages far in excess of $5,000.00.

# V.   <u>CLAIMS</u>

**COUNT I**

**Trade Secret Misappropriation Under the Defend Trade Secret Act (18 U.S.C. § 1836)—Against All Defendants**

164.   Truinject realleges and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

165.   Truinject has information that was secret that derived actual or potential independent economic value because it was kept secret.

166.   Truinject made reasonable efforts to keep the information secret including but not limited to having people sign CDAs before receiving Truinject's information, marking documents as "proprietary" or "confidential," asking people verbally if they were bound to the CDAs before sharing Truinject's trade secrets and limiting employee access to confidential Truinject information.

167.   "An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C.A. § 1836(b)(1) (West)

168.   Truinject's signature technology is Facial Injection Training Technology ("FITT"), a product intended for use in interstate and foreign commerce.

169.   On 25 September 2016, Kovacs signed a CDA. As part of her CDA, Kovacs agreed:

> At all times, both during my employment and after its termination, I will keep and hold all Proprietary Information in strict confidence and trust. I will not use

42

COMPLAINT

or disclose Proprietary Information without the prior written consent of the Company in each instance… ***Upon termination of my employment with the Company, I will promptly deliver to the Company all documents and materials of any nature pertaining to my work with the Company, and I will not take with me or retain in any form any documents or materials or copies containing any Proprietary Information.***

Emphasis added.

170.   On 10 January 2017, Kovacs resigned. It was approximately four months after her hire date.  Kovacs' resignation was "effective immediately".

171.   Prior to leaving the office following her resignation, Kovacs uploaded all of Truinject's corporate records to her own personal Google files. Additionally, Kovacs created secret alternative "backdoor" logins.

172.   Rios learned of the 10 January 2017 upload and on 11 January 2017, Rios emailed Kovacs accepting her resignation and reminding Kovacs that her "confidentiality obligation to Truinject… continue following this separation." Additionally, Rios requested that Kovacs bring her personal computer in to have Truinject files removed.

173.   Instead on 12 January 2017, Kovacs once again accessed the system and uploaded additional items to her personal email at klk92629@gmail.com.  The upload included schematics for design, legal and strategic roadmaps for product rollout, vendor lists, schedules of assets, financial models, accounting and noteholder analysis, CAP tables, and a document including all of Truinject's logins and passwords.

Complaint(675214.2).docx

174.   Rios turned the matter over to Truinject corporate counsel in order to resolve the breach created when Kovacs uploaded the trade secret documents and to assure there would be no further issues.   Kovacs was asked to sign an Exit Declaration under penalty of perjury.

175.   On or about 15 February 2017, Kovacs signed an Exit Declaration stating:

> I hereby confirm that ***I have deleted from any computer to which I may have access***, directly or indirectly, ***any and all confidential files and information belonging to Truinject to which I may have had access during or after my employment with Truinject, and that none of such files or information is any longer accessible, directly or indirectly, by me***, whether in electronic or hard copy form. This includes, but is not limited to the files that were saved to my hard drive during my employment and per the request of Truinject were uploaded to a Google Drive folder on January 12, 2017 and then subsequently deleted, as were all files on my personal computer related to any work product during my employment period. These files were deleted upon the request of Truinject and after confirmation that Truinject had received these files. ***I confirm that I have complied with my obligations of confidentiality to Truinject and will continue to do so.***

Emphasis added.

176.   Following her resignation on 10 January 2017, Kovacs did not have permission, consent, authority or otherwise, to access the password protected Truinject QuickBooks® accounting records.

177.   Rios informed Peterson and Carpou about the resignation of Kovacs. Carpou and Peterson followed-up personally with Kovacs prior to purchasing a second note.

178.   On 9 July 2019 at 6:44 AM, and again on 11 July 2019 at 8:30 PM, the Truinject system was breached, three years after Kovacs' resignation, when Kovacs logged into the password protected Truinject QuickBooks® without authorization or permission.

179.   Kovacs was and is on the Board of Directors at OCTANe and Peterson was on the Executive Committee for OCTANe on the dates of the breach.

180.   The FAC and Notice of Motion for Leave to file the FAC filed by Peterson alleges that on or about 11 July 2019, Peterson learned through confidential sources, that Rios allegedly made an improper use of funds and cites to mischaracterized confidential information.

181.   The Notice of Motion for Leave to File FAC used the misconstrued Protected Truinject QuickBooks® information as part of its basis to file an FAC. Specifically, alleging:

> On or about July 11, 2019—two months after filing his Complaint—Peterson discovered information concerning Rios's spending of company funds. (Reeves Decl., ¶ 3.) As explained in the concurrently filed Proposed First Amended Complaint, in the weeks following Truinject's receipt of funds from the 2016 Note, Rios drastically increased her spending of company funds which were unrelated to the development of Truinject's technology of business. (FAC, ¶ 31.)

182.   Paragraphs 31-33 of the FAC, include a mischaracterization of Trade Secret Protected Truinject Financial information contained in Truinject's Financial QuickBooks®.

183.   The information provided in the FAC came from a "confidential source", who Peterson and Reeves did not want to identify.

45
COMPLAINT

184.   As part of the pleading, Reeves submitted a Declaration stating, "The facts giving rise to the amended allegations were discovered on or about July 11, 2019 after my office discovered information concerning Rios's spending of company funds on herself."  He did so under penalty of perjury under the laws of the State of California.

185.   The information referenced protected trade secret information regarding finances, spending, funding and corporate strategy. This information is found in protected, confidential Truinject QuickBooks® accounting records.

186.   In early-mid 2017, Carpou initiated communications with the Chief Commercial Officer of Allergan on behalf of Truinject, as if he had authority to do so.

187.   Carpou never had the authority to speak on behalf of Truinject.

188.   After finding out about Carpou's conversation with Allergan's CCO, on or about 18 July 2017 11:49 PM, Rios wrote to both Peterson and Carpou regarding the conversation stating, "I was completely surprised as to how a conversation with Meury [Chief Commercial Officer of Allergan] went as far as him placing a value on Truinject and sharing this with you…. Any conversation that goes into that kind of extent should be something Truinject is conducting."

189.   As a result of Kovacs, Carpou, OCTANe, and Peterson's misappropriation, Truinject has been damaged.

190.   Truinject has been harmed by Defendants' misappropriation, and is entitled to recover damages, including up to double damages and attorney's fees for willful and malicious misappropriation.

## COUNT II
## Trade Secret Misappropriation, Cal. Civ. Code § 3426.1 – Against All Defendants

191.   Truinject realleges and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

192.   Under Cal. Civ. Code § 3426.1(b), "Misappropriation" is defined as:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

> (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:

>> (A) Used improper means to acquire knowledge of the trade secret; or

>> (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:

>>> (i) Derived from or through a person who had utilized improper means to acquire it;

>>> (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

>>> (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;…

193.   On 25 September 2016, Kovacs signed a CDA. As part of her CDA, Kovacs agreed:

> At all times, both during my employment and after its termination, I will keep and hold all Proprietary Information in strict confidence and trust. I will not use or disclose Proprietary Information without the prior written consent of the Company in each instance… Upon termination of my employment with the Company, I will

47

promptly deliver to the Company all documents and materials of any nature pertaining to my work with the Company, and I will not take with me or retain in any form any documents or materials or copies containing any Proprietary Information.

194.   On 10 January 2017, Kovacs resigned. It was approximately four months after her hire date.  Kovacs' resignation was "effective immediately".

195.   Prior to leaving the office following her resignation, Kovacs uploaded every corporate file Truinject possessed to her own personal Google files. Additionally, Kovacs created secret alternative "backdoor" logins.

196.   Rios learned of the 10 January 2017 upload and on 11 January 2017, Rios emailed Kovacs accepting her resignation and reminding Kovacs that her "confidentiality obligation to Truinject… continue following this separation." Additionally, Rios requested that Kovacs bring her personal computer in to have Truinject files removed.

197.   Instead on 12 January 2017, Kovacs once again accessed the system and uploaded additional items to her personal email at klk92629@gmail.com.  The upload included schematics for design, legal and strategic roadmaps for product rollout, vendor lists, schedules of assets, financial models, accounting and noteholder analysis, CAP tables, and a document including all of Truinject's logins and passwords.

198.   Rios turned the matter over to Truinject corporate counsel in order to resolve the breach created when Kovacs uploaded the trade secret documents and to assure there would be no further issues.  Kovacs was asked to sign and Exit Declaration under penalty of perjury.

199.   On or about 15 February 2017, Kovacs signed an Exit Declaration stating:

> I hereby confirm that ***I have deleted from any computer to which I may have access***, directly or indirectly, ***any and all confidential files and information belonging to Truinject to which I may have had access during or after my employment with Truinject, and that none of such files or information is any longer accessible, directly or indirectly, by me***, whether in electronic or hard copy form. This includes, but is not limited to the files that were saved to my hard drive during my employment and per the request of Truinject were uploaded to a Google Drive folder on January 12, 2017 and then subsequently deleted, as were all files on my personal computer related to any work product during my employment period. These files were deleted upon the request of Truinject and after confirmation that Truinject had received these files. ***I confirm that I have complied with my obligations of confidentiality to Truinject and will continue to do so.***

Emphasis added.

200.   Following her resignation on 10 January 2017, Kovacs did not have permission, consent, authority or otherwise, to access the password protected Truinject QuickBooks® accounting records.

201.   Rios informed Peterson and Carpou about the resignation of Kovacs. Carpou and Peterson followed-up personally with Kovacs prior to purchasing a second note.

202.   On 9 July 2019 at 6:44 AM, and again on 11 July 2019 at 8:30 PM, the Truinject system was breached, three years after Kovacs' resignation, when Kovacs logged into the password protected Truinject QuickBooks® without authorization or permission.

49

COMPLAINT

203.   Under Cal. Civ. Code § 3426.1(a), "'Improper means' includes theft,... breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."

204.   Kovacs was and is on the Board of Directors at OCTANe and Peterson was on the Executive Committee for OCTANe on the dates of the breach.

205.   The FAC and Notice of Motion for Leave to file the FAC filed by Peterson alleges that on or about 11 July 2019, Peterson learned through confidential sources, that Rios allegedly made an improper use of funds and cites to mischaracterized confidential information.

206.   The Notice of Motion for Leave to File FAC filed by Peterson used the misconstrued Protected Truinject QuickBooks® information as part of its basis to file an FAC. Specifically, alleging:

> On or about July 11, 2019—two months after filing his Complaint—Peterson discovered information concerning Rios's spending of company funds. (Reeves Decl., ¶ 3.) As explained in the concurrently filed Proposed First Amended Complaint, in the weeks following Truinject's receipt of funds from the 2016 Note, Rios drastically increased her spending of company funds which were unrelated to the development of Truinject's technology of business. (FAC, ¶ 31.)

207.   Paragraphs 31-33 of the FAC, include a mischaracterization of Trade Secret Protected Truinject Financial information contained in Truinject's Financial QuickBooks®.

208.   The disclosure or use of another's trade secret by a person who, at the time of the disclosure or use, knew or had reason to know that the trade secret was

derived from or through a person who had utilized improper means to acquire it, is misappropriation. Cal. Civ. Code §3426.1(b)(2)(B)(i).

209.   The information provided in the FAC came from a "confidential source", who Peterson and Reeves did not want to identify.

210.   As part of the pleading, Reeves submitted a Declaration stating, "The facts giving rise to the amended allegations were discovered on or about July 11, 2019 after my office discovered information concerning Rios's spending of company funds on herself."  He did so under penalty of perjury under the laws of the State of California.

211.   The information referenced protected trade secret information regarding finances, spending, funding and corporate strategy. This information is found in protected, confidential Truinject QuickBooks® accounting records.

212.   Civil Code §3426.1(d) defines a trade secret as information that, "[d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use;" and "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

213.   In early-mid 2017, Carpou initiated communications with the Chief Commercial Officer of Allergan on behalf of Truinject, as if he had authority to do so.

214.   Carpou never had the authority to speak on behalf of Truinject.

215.   After finding out about Carpou's conversation with Allergan's CCO, on or about 18 July 2017 11:49 PM, Rios wrote to both Peterson and Carpou

regarding the conversation stating, "I was completely surprised as to how a conversation with Meury [Chief Commercial Officer of Allergan] went as far as him placing a value on Truinject and sharing this with you…. Any conversation that goes into that kind of extent should be something Truinject is conducting."

216. As a result of Kovacs, Carpou, OCTANe, and Peterson's misappropriation, Truinject has been damaged.

217. The aforementioned acts of Defendants, and each of them, were oppressive, fraudulent, and malicious within the meaning of California Civil Code Section 3294. Defendants' actions were committed with the intent to annoy, harass, and vex Truinject; and they were committed with a willful, wanton and conscious disregard of the rights of Truinject. OCTANe authorized and ratified Carpou's wrongful conduct as alleged herein, and the advance knowledge and conscious disregard, authorization and ratification was on the part of an officer, director or managing agent of OCTANe. Truinject is therefore entitled to an award of exemplary damages against all Defendants according to proof.

**COUNT III**
**Computer Fraud Abuse Act (CFAA) (18 U.S.C. § 1030(a)(2, 4, 5), (g), (e)(6))**
**- Against Kimberly Kovacs and James Peterson**

218. Truinject realleges and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

219. Kovacs violated the Computer Fraud Act when she accessed a computer "without authorization," and by exceeding authorized access, in violation of the Computer Fraud Abuse Act (CFAA). 18 U.S.C. § 1030(a)(2, 4, 5), (g), (e)(6).

220. "[Whoever] intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains… information from any protected computer…," may be held civilly liable under 18 U.S.C. § 1030(a)(2) and (g) if the claimant suffers "loss to 1 or more persons during any 1-year period… aggregating at least $5,000 in value."

221. "[Whoever] knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value..." may be held civilly liable under 18 U.S.C. § 1030(a)(4) and (g) if the claimant suffers "loss to 1 or more persons during any 1-year period… aggregating at least $5,000 in value."

222. "[Whoever] intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss" may be held civilly liable under 18 U.S.C. § 1030(a)(5)(C) and (g) if the claimant suffers "loss to 1 or more persons during any 1-year period… aggregating at least $5,000 in value."

223. Kovacs signed an NDA on 15 September 2015 and a CDA on 25 September 2016 when she took on the role of Chief Operating Officer for Truinject.

224. On 10 January 2017, Kovacs requested access to confidential Truinject documents.

225. On 10 January 2017, Kovacs uploaded every corporate file Truinject possessed, including those which Kovacs' was granted access to that day, to her

own personal Google files.  Many of Truinject's corporate files were Confidential Information under the CDA.

226.   On 10 January 2017, after uploading Truinject's corporate files, Kovacs put in her resignation "effective immediately."

227.   Given her sudden departure, Rios looked into the document access that she had granted Kovacs just prior to her resignation.  Rios learned that Kovacs had uploaded every corporate file Truinject possessed to her own personal Google files prior to her departure.

228.   In addition, Kovacs created "backdoor" logins under alternative email addresses, so she could access Truinject's systems at a later date.

229.   After discovering the download, at 8:44 PM on 10 January 2017, Rios disabled Kovacs's access to Truinject's system and any of their supporting programs.  At the time, Rios remained unaware that Kovacs had created more than one access method to enter the system.

230.   On 11 January 2017, Rios emailed Kovacs accepting her resignation the day prior and reminding Kovacs that her "confidentiality obligation to Truinject… continue following this separation."

231.   On 12 January 2017, after her termination Kovacs, without authorization or permission accessed the Truinject password protected system and uploaded additional items to her personal email at klk92629@gmail.com.  The upload included schematics for design, legal and strategic roadmaps for product rollout, vendor lists, schedules of assets, financial models, accounting and

noteholder analysis, capitalization tables, and a document including all of Truinject's logins and passwords.

232.   The 12 January 2017 upload portion of her actions was discovered by Ms. Rios after Kovacs resigned, however, it was not discovered that Kovacs had created multiple unauthorized methods of access.

233.   Using fraudulent concealment in order to deceive Truinject and Rios, on 15 February 2017, Kovacs signed an Exit Declaration stating in part, "I hereby confirm that I have deleted from any computer which I may have access, directly or indirectly, any and all confidential files and information belonging to Truinject… and that none of such files or information is any longer accessible, directly or indirectly, by me, whether in electronic or hard copy form."

234.   On 9 July 2019 and 11 July 2019, Kovacs entered Truinject's password protected QuickBooks® and retrieved confidential information without permission or authorization.

235.   The information taken is protected trade secret information regarding finances, funding and corporate strategy from protected Truinject QuickBooks® Accounting.

236.   "With intent to extort from any person any money or other thing of value, transmits in interstate or foreign commerce any communication containing any… demand or request for money or other thing of value in relation to damage to a protected computer, where such damage was caused to facilitate the extortion," a person may be held civilly liable under 18 U.S.C. § 1030(a)(7)(C) and (g) if the

claimant suffers "loss to 1 or more persons during any 1-year period… aggregating at least $5,000 in value."

237.   In July 2019, personal attorney for James Peterson contacted Truinject's counsel demanding equity or payment or face new charges for Fraud under an amended complaint.

238.   On 30 August 2019, Reeves forwarded a copy of Peterson's FAC, stating "Given Truinject's refusal to pay my client what he is owed, despite his willingness to accept equity for debt, Mr. Peterson has instructed us to proceeds with filing the attached First Amended Complaint."

239.   The information obtained from Kovac's unauthorized access of Truinject computer system was the basis for false claims of Fraud against Truinject and Rios as contained in the FAC.  This resulted in significant costs spent in legal fees to defend Rios and Truinject against the false allegations that arose from the stolen financial records.

240.   Additionally, the services of Attorney Simon Inman, were enlisted to handle the breach which occurred upon her resignation in early 2017, to ensure that Kovacs no longer had access to password protected confidential information that was taken without authorization, ensuring Kovacs did not have access to computer files

241.   Truinject has incurred losses in excess of $5,000.00.

242.   Truinject has been harmed by Defendants' fraud, and is entitled to recover damages.

Complaint(675214.2).docx

**COUNT IV**

**Breach of Contract (26 November 2016 and 13 February 2017 Convertible Promissory Notes) – Against James A. Peterson**

243.   Truinject realleges and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

244.   On two separate occasions—26 November 2016, and 13 February 2017—Peterson entered into valid Notes with Truinject pursuant to NPAs dated as of 4 August 2015, and 15 December 2016, respectively.

245.   The 26 November 2016 Note is a part of the August 2015 tranche.

246.   The 13 February 2017 Note is a part of the December 2016 tranche.

247.   Peterson currently owns 28% of the outstanding debt in the August 2015 tranche and 15% of the outstanding debt in the December 2016 tranche.

248.   The Notes, NPAs and Amendments thereto, constituted binding contracts between Truinject and Peterson.

249.   Under the terms of the Notes, Peterson is required to provide written notice with prior written consent of the Majority Holders of the Default Event and intent to collect.

250.   "Event Default" includes if "[t]he Company fails to make any payment when due under the Note on the applicable due date," and is controlled by section 5.2.

251.   Section 5.2 of the Notes state:

> Upon the occurrence of any Event of Default all accrued but unpaid expenses, accrued but unpaid interest, all principal and any act other amounts outstanding under this Note shall . . . (ii) *in the case of any Event of Default* other than under Section 5.1(b) above, become

immediately due and payable upon ***written notice by or on behalf of Holder to the Company but only if such notice is given with the prior written consent of the Majority Holders.*** Notwithstanding any other provision of this Note, or of this Note and the other Financing documents only in concert with all other holders of outstanding Notes as provided in the Financing Documents and ***will not take any action, including commencement or prosecution of litigation or any other proceeding to collect this Note, except as agreed by the Majority Holders***.

Emphasis added.

252.   Peterson failed to provide written notice to the Company with the prior written consent of the Majority Holders.

253.   Peterson's failure to obtain consent, agreement or provide written notice of the Majority Holders, constitutes a breach of the Notes.

254.   Under the terms of the Notes, Peterson is required to obtain agreement of the Majority Holders prior to commencement of litigation intended to collect on the Notes.

255.   Peterson commenced litigation to collect on the Notes without agreement, consent or notice of the Majority Holders.

256.   Peterson's commencement of litigation to collect on the Notes, without notice or agreement of Majority Holders, constitutes a breach of the Notes.

257.   Truinject performed all conditions required under the Notes.

258.   As a result of Peterson's breach of both contracts, Truinject has been damaged in an amount to be proven at trial.

259.   Truinject is also entitled to recovery of its expenses incurred to enforce its rights under the Notes including, but not limited to, attorney's fees.

COMPLAINT

**COUNT V**

**Breach of Contract (15 September 2015 NDA) – Against Kimberly Kovacs**

260.   Truinject realleges and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

261.   On 15 September 2015, Kovacs entered into a valid NDA with Truinject.

262.   The NDA constituted a binding contract between Truinject and Kovacs.

263.   Under the terms of the 15 September 2015 NDA, Kovacs agreed to the following:

> (i) to maintain all Confidential information in strict confidence; (ii) not to disclose Confidential Information to any third parties; (iii) not copy or otherwise reproduce Confidential Information in whole or in part; and (iv) not to use Confidential Information for any purpose except for the Business Purpose.

264.   Pursuant to the 15 September 2015 NDA, "Business Purpose" is the "Company and [Kovacs'] desire to begin discussions regarding a business opportunity of mutual interest."

265.   The NDA is valid through September 2020.

266.   On 12 January 2017, following her resignation, Kovacs accessed the password protected system and uploaded confidential trade secret documents to her personal email at klk92629@gmail.com.   The upload included schematics for design, legal and strategic roadmaps for product rollout, vendor lists, schedules of assets, financial models, accounting and noteholder analysis, capitalization tables, and a document including all of Truinject's logins and passwords.

59

COMPLAINT

267.   In February 2017, Kovacs was contacted by corporate counsel regarding the download of confidential Truinject documents.  Kovacs was asked to sign an Exit Declaration.  Kovacs swore under penalty of perjury that she no longer had access to confidential Truinject information, fraudulently concealing her continuing access to confidential information.

268.   On 9 July 2019 and 11 July 2019, three years after her resignation and without authorization or permission, Kovacs logged in to Truinject's Financial QuickBooks® account containing trade secrets for Truinject using an unauthorized "backdoor" login.

269.   Truinject's Financial QuickBooks® account contains sensitive financial information.

270.   The Financial QuickBooks® information contains protected trade secret information regarding finances, funding and corporate strategy from password protected Truinject QuickBooks® Accounting.

271.   This information was shared with Reeves and Peterson.

272.   The FAC and Notice of Motion for Leave to file the FAC filed by Reeves, on behalf of Peterson alleges that on or about 11 July 2019, Peterson learned through confidential sources, that Rios allegedly made an improper use of funds and cites to mischaracterized confidential information.

273.   Truinject performed all conditions required under the NDA.

274.   As a result of Kovac's breach of the NDA, Truinject has been damaged in an amount to be proven at trial.

COMPLAINT

Complaint(675214.2).docx

275.   Truinject is also entitled to recovery of its expenses incurred to enforce its rights under the Notes including, but not limited to, attorney's fees.

## COUNT VI
## Breach of Contract (25 September 2016 CDA) – Against Kimberly Kovacs

276.   Truinject realleges and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

277.   On 25 September 2016, Kovacs entered into a valid CDA with Truinject.

278.   The NDA constituted binding contracts between Truinject and Kovacs.

279.   Under the terms of the 25 September 2016 CDA Kovacs agreed:

> At all times, both during my employment ***and after its termination***, I will keep and hold all Proprietary Information in strict confidence and trust. I will not use or disclose Proprietary Information without the prior written consent of the Company in each instance… ***Upon termination of my employment*** with the Company, I will promptly deliver to the Company all documents and materials of any nature pertaining to my work with the Company, and ***I will not take with me or retain in any form any documents or materials or copies containing any Proprietary Information***.

Emphasis added.

280.   "Proprietary Information" is defined in Section 8 of the 25 September 2016 CDA as,

> [A]ny information or materials of a confidential or secret nature that may be made, created or discovered by me or that may be disclosed to me by the Company or a third party in relation to the business of the Company or to the business of any parent,, subsidiary, affiliate, customer or

supplier of the Company, or any other party with whom the Company agrees to hold such information or materials in confidence.

281. On 10 January 2017, just prior to her resignation, Kovacs uploaded every single corporate file Truinject possessed to her own personal Google files before leaving the office with her personal computer in hand. Many of the corporate files Kovacs downloaded were Confidential.

282. On 12 January 2017, Kovacs once again accessed the system and uploaded additional items to her personal email at klk92629@gmail.com. The upload included schematics for design, legal and strategic roadmaps for product rollout, vendor lists, schedules of assets, financial models, accounting and noteholder analysis, capitalization tables, and a document including all of Truinject's logins and passwords.

283. Upon information and belief, Kovacs created several "backdoor" logins without consent, permission or authorization.

284. In February 2017, Kovacs was contacted by corporate counsel regarding the download of confidential Truinject documents. Kovacs was asked to sign an Exit Declaration. Kovacs swore under penalty of perjury that she no longer had access to confidential Truinject information, fraudulently concealing her continuing access to confidential information.

285. On 9 July 2019 and 11 July 2019, three years after her resignation and without authorization or permission, Kovacs logged in to Truinject's Financial QuickBooks® account containing trade secrets for Truinject using an unauthorized "backdoor" login.

286.   Truinject's Financial QuickBooks® account contains sensitive financial information.

287.   This information was shared with Reeves and Peterson.

288.   The FAC and Notice of Motion for Leave to file the FAC filed by Reeves, on behalf of Peterson allege that on or about 11 July 2019, Peterson learned through confidential sources, that Rios allegedly made an improper use of funds and cites to mischaracterized confidential information.

289.   Truinject performed all conditions required under the CDA.

290.   As a result of Kovac's breach of the CDA, Truinject has been damaged in an amount to be proven at trial.

291.   Truinject are also entitled to recovery of its expenses incurred to enforce its rights under the Notes including, but not limited to, attorney's fees.

**COUNT VII**
**Breach of Contract (7 October 2016 NDA) – Against William Carpou**

292.   Truinject realleges and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

293.   On 7 October 2016, William Carpou personally signed an NDA on behalf of OCTANe.

294.   Carpou signed the NDA in order to purchase a convertible promissory note on behalf of himself and his wife.

295.   On 18 October 2017, Carpou entered into a Note Repurchase Agreement once again adopting the 7 October 2016 NDA. Under the Note Repurchase Agreement Section 5(c) between Carpou and Truinject, the parties agreed, "[n]othing in this Agreement…. shall release, modify discharge or

63

otherwise apply to the… obligations, rights, duties and provisions of the October 7, 2016 Non-Disclosure Agreement attached hereto as Exhibit C…"

296.   Pursuant to the terms of the NDA, Carpou agreed:

(i) to maintain all Confidential information in strict confidence; (ii) not to disclose Confidential Information to any third parties; (iii) not copy or otherwise reproduce Confidential Information in whole or in part; and (iv) not to use Confidential Information for any purpose except for the Business Purpose.

297.   On 12 January 2017, Rios and Carpou had a confidential discussion about the minimum amount Truinject would accept, which reflects negotiation strategy, should Truinject receive an offer. Truinject never received an offer.

298.   Following that confidential discussion, an email was sent by Carpou to Rios on 12 January 2017 at 3:41 PM, acknowledging the nature of what was discussed where Carpou stated to Rios, "$150m is a good first offer…….(yes, I know confidential)."

299.   To confirm that the information was not to be shared, Rios responded directly to Carpou on 12 January 2017 at 3:54 PM, by confirming that the numbers discussed were "super confidential."

300.   Carpou disclosed this information directly to Peterson, Kovacs and Reeves.

301.   The subject of the email containing the confidential information is titled "Re: Lynn Salo".

302.   Between 25 March 2019 and 27 March 2019, the email titled "Re: Lynn Salo" was opened, published and shared by Carpou at least 3 times, including with persons in Costa Mesa, San Clemente and Laguna Hills, California and others.

303.   Reeves's Orange County Office is located in Costa Mesa, California.

304.   On information and belief, Petersons residence is in the zip code, 92674 identified as San Clemente, California.

305.   On information and belief, Kovacs residence is in the zip code 92677 identified as Laguna Hills, California.

306.   Paragraph 26 of the FAC filed by Reeves on behalf of Peterson on 21 January 2020, falsely alleges, "To keep her investors happy, and to promote further infusions of cash, on January 12, 2017, Rios wrote to Carpou stating that Allergan had made an offer to acquire Truinject for at least $150,000,000. Rios intended Carpou to relay this information to other investors, including [Peterson]."

307.   In early-mid 2017, Carpou initiated communications with the Chief Commercial Officer of Allergan as if he were acting on behalf of Truinject, sharing confidential information.

308.   Carpou breached the NDA by disclosing Truinject information to Peterson, Reeves and Allergan, among others.

309.   Truinject performed all conditions required under the Notes.

310.   As a result of Carpou's breach of the 7 October 2016 NDA, Truinject has been damaged in an amount to be proven at trial.

311.   Truinject is also entitled to recovery of its expenses incurred to enforce its rights under the Notes including, but not limited to, attorney's fees.

**COUNT VIII**
**Breach of Contract (7 October 2016 NDA) – Against OCTANe**

312.   Truinject realleges and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

313.   On 7 October 2016, William Carpou, Chief Executive Officer of OCTANe, signed a NDA on behalf of OCTANe.

314.   Under the respondeat superior doctrine, an employer is vicariously liable for its employees' torts that are committed within the scope of the employment. *See Perry v. County of Fresno* (2013) 215 Cal. App. 4th 94, 101.

315.   "In California, the scope of employment has been interpreted broadly under the respondeat superior doctrine." *Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1004.

316.   The agreement remains valid through October 2021.

317.   Pursuant to the terms of the NDA, OCTANe agreed:

> (i) to maintain all Confidential information in strict confidence; (ii) not to disclose Confidential Information to any third parties; (iii) not copy or otherwise reproduce Confidential Information in whole or in part; and (iv) not to use Confidential Information for any purpose except for the Business Purpose.

318.   On 12 January 2017, Rios and Carpou, the CEO of OCTANe, had a confidential discussion about what would constitute a good first offer, which reflects negotiation strategy, should Truinject receive an offer. Truinject never received an offer.

319.   Following that confidential discussion, an email was sent by Carpou from his OCTANe email address, bill@octaneoc.org, to Rios on 12 January 2017

at 3:41 PM, acknowledging the nature of what was discussed where Carpou stated to Rios, "$150m is a good first offer.......(yes, I know confidential)."

320.   To confirm that the information was not to be shared, Rios responded directly to Carpou at his OCTANe email, on 12 January 2017 at 3:54 PM, by confirming that the numbers discussed were "super confidential."

321.   The subject of the email sent to the CEO of OCTANe containing the confidential information was titled "Re: Lynn Salo".

322.   Between 25 March 2019 and 27 March 2019, the email titled "Re: Lynn Salo" was opened, shared and published at least 3 times to persons in Costa Mesa, San Clemente and Laguna Hills, California.

323.   Reeves's Orange County Office is located in Costa Mesa, California.

324.   On information and belief, Petersons residence is in the zip code, 92674 identified as San Clemente, California.

325.   On information and belief, Kovacs residence is in the zip code 92677 identified as Laguna Hills, California.

326.   Paragraph 26 of the FAC filed by Reeves on behalf of Peterson on 21 January 2020 falsely alleges, "To keep her investors happy, and to promote further infusions of cash, on January 12, 2017, Rios wrote to Carpou stating that Allergan had made an offer to acquire Truinject for at least $150,000,000. Rios intended Carpou to relay this information to other investors, including [Peterson]."

327.   OCTANe and Allergan have a symbiotic relationship based on the nature of their respective businesses.

328.   In early-mid 2017, Carpou, acting under his perceived role as CEO of OCTANe, initiated communications with the CEO of Allergan regarding Truinject confidential information.

329.   OCTANe never had the authority to speak on behalf of Truinject nor disclose confidential information.

330.   Truinject performed all conditions required under the NDA.

331.   As a result of OCTANe's breach of the 7 October 2016 NDA, Truinject has been damaged in an amount to be proven at trial.

332.   Truinject is also entitled to recovery of its expenses incurred to enforce its rights under the Notes including, but not limited to, attorney's fees.

### COUNT IX
### Breach of Contract Good Faith and Fair Dealings – Against All Defendants

333.   Truinject realleges and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

334.   A party to a contract breaches the implied covenant of good faith and fair dealing by interfering with or failing to cooperate with the plaintiff in performance of the contract.  Witkin, Summary of California Law, Contracts, §744 (8th ed.); *see also Sutherland v. Barclays American/Mortgage Corp*., 53 Cal. App. 4th 299, 314, 61 Cal Rptr. 2d 614 (1997); *Harm v. Frasher*, 181 Cal. App. 2d 405, 417, 5 cal. Raptor. 367, 373 (1960).

335.   This duty requires that neither party do anything that prevents the other party from receiving the benefits of the agreement.

336.   By their actions described herein, Defendants have breached, and continue to breach the Covenant of Good Faith and Fair Dealings.

68

COMPLAINT

337. Defendants' conduct is particularly egregious in light of their knowledge of the Nestlé Case and their actions to directly undermine the pending litigation.

### A. **James Peterson**

338. On 26 November 2016 and 13 February 2017, Peterson entered into valid Notes with Truinject pursuant to NPAs dated 4 August 2015, and 15 December 2016, respectively.

339. On or about 17 October 2017, Peterson entered into a Note Repurchase Agreement with Truinject once again adopting the 22 November 2016 CDA. Pursuant to Section 5(c) the parties agreed, "[n]othing in this Agreement…. shall release, modify discharge or otherwise apply to the… obligations, rights, duties and provisions of the November 22, 2016 Confidential Disclosure Agreement attached hereto as Exhibit C…"

340. By agreeing to the terms of the CDA, Peterson agreed,

> [T]o protect the Disclosing Party's Confidential Information with the same degree of care that *the Receiving Party employs with respect to its confidential information of like importance in order to prevent the unauthorized use, disclosure, publication or dissemination thereof*, but in no event less than a commercially reasonable degree of care.

341. The Covenant of Good Faith and Fair Dealings is implied in every contract, including the 26 November 2016 and 13 February 2017 Convertible Promissory Notes and the 17 October 2017 Repurchase Agreement between Peterson and Truinject.

Complaint(675214.2).docx

342.   By his actions described herein, Peterson has been unfaithful to the purpose of the 26 November 2016 and 13 February 2017 Convertible Promissory Notes, as well as, the 22 November 2016 CDA.

343.   By his actions described herein, Peterson has deprived Truinject of the benefits of the 26 November 2016 and 13 February 2017 Convertible Promissory Notes, as well as, the 22 November 2016 CDA.

344.   Peterson was aware that he had no grounds to file suit under the terms of the agreement. On 9 March 2019, Peterson sent a text to Rios, stating, "I understand the situation but I care less of how many investors ! I want my original documents honored ! I want my % of ownership".

345.   Peterson threaten to negatively impact the Nestlé Case if he was not granted equity to which he was not entitled, or paid out approximately $300,000.00 more than his outstanding notes.

346.   Peterson used confidential witnesses, subterfuge and stolen trade secret information in order to file a meritless lawsuit geared to force Truinject into granting him equity to which he was not entitled.

347.   As a result of Peterson's material breach, Truinject has suffered and continues to suffer damages in an amount to be proven at trial.

348.   This claim arises out of contracts.

349.   Truinject is entitled to its attorney's fees and costs.

**B.**   **Kimberly Kovacs**

350.   On 15 September 2015 Kovacs entered into a NDA with Truinject.

351.   On 25 September 2016 Kovacs entered into a CDA with Truinject.

Complaint(675214.2).docx

352.   The Covenant of Good Faith and Fair Dealings is implied in every contract, including the 15 September 2015 NDA and 25 September 2016 CDA, between Kovacs and Truinject.

353.   By her actions described herein, Kovacs has been unfaithful to the purpose of the 15 September 2015 NDA and 25 September 2016 CDA.

354.   By her actions described herein, Kovacs has deprived Truinject of the benefits of the 15 September 2015 NDA and 25 September 2016 CDA.

355.   Kovacs acted in bad faith by creating "backdoor" logins that would allow her covert access to Truinject's confidential information after her access and permission to access had been terminated.

356.   Kovacs acted in bad faith by breaching the Truinject Password Protected system on 10 January 2017, 12 January 2017, 9 July 2019 and 11 July 2019, in violation of the terms of the NDA and CDA.

357.   Kovacs fraudulently signed an Exit Declaration in order to conceal her duplicity.

358.   Kovacs acted in bad faith when she provided illegally obtained, protected trade secret information for the purpose of being used in pending litigation, and deprives Truinject of its protected, confidential trade secrets.

359.   As a result of Kovacs's material breach, Truinject has suffered and continues to suffer damages in an amount to be proven at trial.

360.   This claim arises out of contracts.

361.   Truinject is entitled to its attorney's fees and costs.

COMPLAINT

Complaint(675214.2).docx

C.      **William Carpou**

362.    On 7 October 2016, Carpou entered into an NDA on behalf of himself and OCTANe. On 9 January 2017, Carpou entered into a convertible promissory note. On or about 17 October 2017, Carpou entered into a Note Repurchase Agreement.

363.    Under the Note Repurchase Agreement Carpou once again adopted the 7 October 2016 NDA. Section 5(c)of the NDA between Carpou and Truinject states, "[n]othing in this Agreement…. shall release, modify discharge or otherwise apply to the… obligations, rights, duties and provisions of the October 7, 2016 Non-Disclosure Agreement attached hereto as Exhibit C…"

364.    The Covenant is implied in every contract, including the 7 October 2016 NDA, 9 January 2017 Note, and 17 October 2017 Repurchase Agreement between Carpou and Truinject.

365.    By his actions described herein, Carpou has been unfaithful to the purpose of the 7 October 2016 NDA, 9 January 2017 Note, and 17 October 2017 Repurchase Agreement.

366.    By his actions described herein, Carpou has deprived Truinject of the benefits of the 7 October 2016 NDA, 9 January 2017 Note, and 17 October 2017 Repurchase Agreement.

367.    Carpou disclosed confidential information maliciously and continues to do so by sharing confidential emails and by going behind Truinject's NDA to have privileged conversation to which he knew he was not authorized to have with the Chief Commercial Officer of Allergan, note holders, Peterson and Reeves.

368.   Carpou shared numerous confidential emails immediately after finding out about possible litigation between Peterson and Truinject.

369.   As a result of Carpou's material breach, Truinject has suffered and continues to suffer damages in an amount to be proven at trial.

370.   This claim arises out of contracts.

371.   Truinject is entitled to its attorney's fees and costs.

**D.**   **OCTANe**

372.   On 7 October 2016, Carpou entered into an NDA on behalf of himself and OCTANe.

373.   The Covenant is implied in every contract, including the 7 October 2016, NDA between OCTANe and Truinject.

374.   By its actions described herein, Carpou acting on behalf of OCTANe has been unfaithful to the purpose of the 7 October 2016 NDA.

375.   By its actions described herein, Carpou acting on behalf of OCTANe has deprived Truinject of the benefits of the 7 October 2016 NDA.

376.   OCTANe used Truinject without authorization, permission or consent as leverage in negotiations for a partnership with Allergan.

377.   As a result of OCTANe's material breach of the Covenant, Truinject has suffered and continues to suffer damages in an amount to be proven at trial.

378.   This claim arises out of a contract.

379.   Truinject performed all conditions required under the contracts.

380.   As a result of Defendants' breaches, Truinject has been damaged in an amount to be proven at trial.

73

381.   Truinject is also entitled to recovery of its expenses incurred to enforce its rights under the Notes including, but not limited to, attorney's fees.

**COUNT X**
**Fraud, Cal. Civ. Code § 1710 – Against Kimberly Kovacs**

382.   Truinject realleges and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

383.   California Civil Code Section 1709 states that "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

384.   California Civil Code Section 1710 defines "deceit" as "[t]he suggestion as a fact, of that which is not true, by one who does not believe it to be true," "[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true," "[t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact," or "[a] promise, made without any intention of performing it."

385.   Kimberly Kovacs violated California Civil Code Sections 1709 and 1710, by fraudulently misrepresenting in an Exit Declaration signed on or about 15 February 2017, under penalty of perjury under the laws of the State of California, swearing:

> I hereby confirm that ***I have deleted from any computer to which I may have access***, directly or indirectly, ***any and all confidential files and information belonging to Truinject to which I may have had access during or after my employment with Truinject, and that none of such files or information is any longer accessible,***

74
COMPLAINT

***directly or indirectly, by me***, whether in electronic or hard copy form. This includes, but is not limited to the files that were saved to my hard drive during my employment and per the request of Truinject were uploaded to a Google Drive folder on January 12, 2017 and then subsequently deleted, as were all files on my personal computer related to any work product during my employment period. These files were deleted upon the request of Truinject and after confirmation that Truinject had received these files. ***I confirm that I have complied with my obligations of confidentiality to Truinject and will continue to do so.***

Emphasis added.

386.   The representations made by Kovacs was false when they were made.

387.   Kovacs had no intention of performing her promises.

388.   Kovacs intended the representations to conceal her fraudulent actions.

389.   Truinject and Rios justifiably relied on Kovacs' misrepresentations.

390.   As a direct and proximate result of the violation of Civil Code Sections 1709 and 1710, Truinject has been damaged in an amount to be proven at trial.

391.   The aforementioned acts of Defendant were oppressive, fraudulent, and malicious within the meaning of California Civil Code Section 3294. Defendant's actions were committed with the intent to annoy, harass, and vex Truinject; and they were committed with a willful, wanton and conscious disregard of the rights of Truinject. Truinject is therefore entitled to an award of exemplary damages against all Defendants according to proof.

Complaint(675214.2).docx

**COUNT XI**
**Negligent Misrepresentation, Ca. Civ. Code § 1710 – Against Kimberly Kovacs**

392.   Truinject realleges and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

393.   California Civil Code Section 1709 states that "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

394.   California Civil Code Section 1710 defines "deceit" as "[t]he suggestion as a fact, of that which is not true, by one who does not believe it to be true," "[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true," "[t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact," or "[a] promise, made without any intention of performing it."

395.   Negligent Misrepresentation requires: "(1) misrepresentation of a past or existing material fact, without reasonable ground for believing it to be true, and with intent to induce another's reliance on the fact misrepresented; (2) ignorance of the truth and justifiable reliance on the misrepresentation by the party to whom it was directed; and (3) resulting damage." *Hydro-Mill Co. v. Hayward, Tilton & Rolapp Ins. Assocs., Inc.*, 115 Cal. App. 4th 1145, 10 Cal. Rptr. 3d 582 (2004).

396.   Kimberly Kovacs violated California Civil Code Sections 1709, 1710 by negligently misrepresenting in an Exit Declaration signed on or about 15

February 2017, under penalty of perjury under the laws of the State of California, swearing:

> I hereby confirm that *I have deleted from any computer to which I may have access*, directly or indirectly, *any and all confidential files and information belonging to Truinject to which I may have had access during or after my employment with Truinject, and that none of such files or information is any longer accessible, directly or indirectly, by me*, whether in electronic or hard copy form. This includes, but is not limited to the files that were saved to my hard drive during my employment and per the request of Truinject were uploaded to a Google Drive folder on January 12, 2017 and then subsequently deleted, as were all files on my personal computer related to any work product during my employment period. These files were deleted upon the request of Truinject and after confirmation that Truinject had received these files. *I confirm that I have complied with my obligations of confidentiality to Truinject and will continue to do so.*

Emphasis added.

397.  Kovacs made the representations without reasonable ground for believing them to be true.

398.  Kovacs intended to induce Truinject's reliance on the facts misrepresented.

399.  Truinject and Rios justifiably relied on Kovacs' misrepresentations.

400.  As a direct and proximate result Kovacs negligent misrepresentation, Plaintiffs have been damaged in an amount to be proven at trial.

401.  The aforementioned acts of Defendant were oppressive, fraudulent, and malicious within the meaning of California Civil Code Section 3294. Defendant's actions were committed with the intent to annoy, harass, and vex

77

COMPLAINT

Truinject; and they were committed with a willful, wanton and conscious disregard of the rights of Truinject. Truinject is therefore entitled to an award of exemplary damages against all Defendants according to proof.

**COUNT XII**
**Breach of Fiduciary Duty – Against Kimberly Kovacs**

402.   Truinject realleges and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

403.   Elements of a cause of action for breach of fiduciary duty are: (1) the existence of a fiduciary duty; (2) the breach of that duty; and (3) damage proximately caused by that breach. *IIG Wireless, Inc. v. Yi*, 22 Cal. App. 5th 630, 231 Cal. Rptr. 3d 771 (Ct. App. 2018).

404.   On 25 September 2016, Kovacs became Chief Operating Officer for Truinject accepting and signing the official 22 September 2016 offer.

405.   By virtue of her employment and position, Kovacs owed a fiduciary duty to Truinject.

406.   As a condition of her employment Kovacs signed a CDA.

407.   The CDA acknowledges in part that Kovacs's "employment by the Company creates a relationship of confidence and trust with respect to any information or materials of a confidential or secret nature that may be made, created or discovered by me or that may be disclosed to me by the Company.…" Moreover, the agreement includes a clause stating:

> At all times, both during my employment and after its termination, ***I will keep and hold all Proprietary Information in strict confidence and trust***. I will not use or disclose Proprietary Information without the prior

78
COMPLAINT

written consent of the Company in each instance….
**_Upon termination of my employment with the Company_**, I will promptly deliver to the Company all documents and materials of any nature pertaining to my work with the Company, **_and I will not take with me or retain in any form any documents or materials or copies containing any Proprietary Information_**.

Emphasis added.

408.   As a director and/or officer of Truinject, Defendant owed fiduciary duties of care, loyalty and good faith to Truinject.

409.   On 10 January 2017, Kovacs requested access to confidential Truinject documents.

410.   On 10 January 2017, Kovacs uploaded every single corporate file Truinject possessed to her own personal Google files.   Many of Truinject's corporate files were Confidential Information under the CDA.

411.   On 10 January 2017, after uploading Truinject's corporate files, she put in her resignation "effective immediately."

412.   Prior to her departure, while she still had full access, Kovacs created "backdoor" logins under alternative emails, so she could access Truinject's systems at a later date.

413.   On 12 January 2017, Kovacs without authorization or permission accessed the Truinject password protected system and uploaded additional items to her personal email at klk92629@gmail.com.   The upload included schematics for design, legal and strategic roadmaps for product rollout, vendor lists, schedules of assets, financial models, accounting and noteholder analysis, capitalization tables, and a document including all of Truinject's logins and passwords.

414.    Using fraudulent concealment in order to deceive Truinject and Rios, on 15 February 2017, Kovacs signed an Exit Declaration stating in part, "I hereby confirm that I have deleted from any computer which I may have access, directly or indirectly, any and all confidential files and information belonging to Truinject… and that none of such files or information is any longer accessible, directly or indirectly, by me, whether in electronic or hard copy form."

415.    On 9 July 2019 and 11 July 2019, Kovacs entered Truinject's password protected QuickBooks® and retrieved confidential information.

416.    Defendant breached her fiduciary duty of care by, among other things, failing to comply with the terms of Truinject's governing corporate documents, confidentiality agreements, exit declaration, document and/or program access permission and applicable corporate law.

417.    Defendant breached her duties of loyalty and good faith by, among other things, failing to uphold or abide by the terms of the Exit Declaration, failing to uphold or abide by confidential disclosure agreements and creating backdoor logins without the permission, consent or knowledge of Truinject and stealing Truinject's information.

418.    As a direct and proximate result of Kovacs' breach of fiduciary duties, Truinject has been damaged in an amount to be proven at trial.

419.    The aforementioned acts of Defendant were oppressive, fraudulent, and malicious within the meaning of California Civil Code Section 3294. Defendant's actions were committed with the intent to annoy, harass, and vex Truinject; and they were committed with a willful, wanton and conscious disregard

of the rights of Truinject. Truinject is therefore entitled to an award of exemplary damages against all Defendants according to proof.

## COUNT XIII
### Aiding and Abetting Breach of Fiduciary Duty – Against James Peterson

420.   Truinject realleges and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

421.   A person may be liable for aiding and abetting a breach of fiduciary duty under two theories: first, if the aider and abettor owes a fiduciary duty to the victim provides substantial assistance to the person breaching his or her fiduciary duty, courts impose liability for concerted action that violates the aider and abettor's fiduciary duty; and second, if the aider and abettor commits an independent tort by making a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act. *Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 171 Cal. Rptr. 3d 548 (2014), as modified (May 27, 2014)

422.   Peterson communicated directly with Kovacs both during her employment as Chief Operating Officer for Truinject and after her resignation.

423.   Peterson was aware of the contractual and fiduciary relationship between Kovacs and Truinject, by virtue of her status as a Note Holder, Chief Operating Officer and Advisor.

424.   Peterson was aware Kovacs downloaded a number of trade secret protected documents prior to her resignation.

425.   On information and belief, Peterson sought to acquire Truinject's confidential trade secret information from Kovacs.

426.   Peterson acted and continues to act with knowledge of, or with reckless disregard to, the fact that Kovacs is in breach of her fiduciary duties to Truinject, and has participated in such breaches of fiduciary duties by virtue of committing trade secret misappropriation as alleged in the below paragraphs, realleged and incorporated herein by reference.

427.   As a direct and proximate result of Peterson's aiding and abetting Kovacs' Breach of Fiduciary Duties, Truinject has been damaged in an amount to be proven at trial.

428.   The aforementioned acts of Defendant were oppressive, fraudulent, and malicious within the meaning of California Civil Code Section 3294. Defendant's actions were committed with the intent to annoy, harass, and vex Truinject; and they were committed with a willful, wanton and conscious disregard of the rights of Truinject. Truinject is therefore entitled to an award of exemplary damages against all Defendants according to proof.

### COUNT XIV
### Breach of Confidential Relationship – Against William Carpou, OCTANe and Kimberly Kovacs

429.   Truinject realleges and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

430.   A plaintiff's idea may be protected on the theory of breach of a confidential relationship requires: 1) conveyance of confidential and novel information; 2) that the offeree has knowledge that the information was being disclosed in confidence; 3) a mutual understanding between the offeror and offered

COMPLAINT

Complaint(675214.2).docx

that the confidence be maintained; and 4) disclosure. *Aliotti v. Dankin & Co.*, 831 F. 2d 898, 903 (9th Cir. 1987).

431.   A cause of action for Breach of Confidential Relationship must be based on a contract that protects that confidence.  *Davies v. Krasna*, 14 Cal. 3d 502, 505, 121 Cal. Rptr. 705 (1975).

A.   <u>**Truinject Conveyed Confidential Information to Kimberly Kovacs that Kimberly Kovacs Knew was Disclosed in Confidence with a Mutual Understanding That the Confidence be Maintained**</u>

432.   On two separate occasions—15 September 2015 and 25 September 2016—Kovacs entered into a valid NDA and CDA, respectively.

433.   On 10 January 2017, Kovacs had an employee review with Rios. During the meeting, Kovacs requested access to confidential Truinject documents. Kovacs argued that Rios didn't fully trust her because she did not have unlimited access to Truinject protected documents.

434.   Rios granted the request to show Kovacs that she was a trusted employee, and she was given full access.

435.   Hours later Kovacs resigned. The resignation was approximately four months after Kovacs' hire date and was "effective immediately".

436.   On 11 January 2017, Rios emails Kovacs accepting her resignation the day prior and reminding Kovacs that her "confidentiality obligation to Truinject… continue following this separation."

437.   On 12 January 2017, Kovacs once again accessed the system through a "backdoor" login and uploaded additional items to her personal email at

COMPLAINT

klk92629@gmail.com.   The upload included schematics for design, legal and strategic roadmaps for product rollout, vendor lists, schedules of assets, financial models, accounting and noteholder analysis, CAP tables, and a document including all of Truinject's logins and passwords.

438.   In February 2017, Inman contacted Kovacs about the documents Kovacs downloaded to her personal Gmail account and any other documents she still had in her possession.

439.   Inman informed her that the documents were separately uploaded to Kovacs' private email account and based on that he asked Kovacs to delete the documents and sign and date an Exit Declaration stating in part:

> I hereby confirm that I have deleted from any computer which I may have access, directly or indirectly, any and all confidential files and information belonging to Truinject… and that none of such files or information is any longer accessible, directly or indirectly, by me, whether in electronic or hard copy form.

440.   Kovacs signed the Exit Declaration "under penalty of perjury under the laws of the State of California…".

**B.   Kimberly Kovacs Disclosed the Protected Confidential Information Conveyed in Confidence with a Mutual Understanding That the Confidence be Maintained**

441.   On 9 July 2019 and 11 July 2019, without authorization or permission, Kovacs logged in to Truinject's financial QuickBooks® account containing trade secrets for Truinject.

442.   Kovacs logged in using one of the "backdoor" logins she had created prior to her resignation as Chief Operating Officer.

443.   The FAC and Notice of Motion for Leave to file the FAC filed by Reeves, on behalf of Peterson allege that on or about 11 July 2019, Peterson learned through confidential sources, that Rios allegedly made an improper use of funds and cites to mischaracterized confidential information.

444.   The Notice of Motion for Leave to File FAC used the misconstrued Protected Truinject QuickBooks® information as part of its _basis_ to file an FAC. Specifically, alleging:

> On or about July 11, 2019—two months after filing his Complaint—Peterson discovered information concerning Rios's spending of company funds. (Reeves Decl., ¶ 3.) As explained in the concurrently filed Proposed First Amended Complaint, in the weeks following Truinject's receipt of funds from the 2016 Note, Rios drastically increased her spending of company funds which were unrelated to the development of Truinject's technology of business. (FAC, ¶ 31.)

445.   Paragraphs 31-33 of the FAC, include a mischaracterization of confidential, trade secret protected, Truinject Financial information contained in Truinject's Financial QuickBooks®.

**C.**   **Truinject Conveyed Confidential Information to William Carpou that William Carpou knew was Disclosed in Confidence with a Mutual Understanding That the Confidence be Maintained**

446.   On 7 October 2016, Carpou personally signed a NDA on behalf of OCTANe.

447.   On 12 January 2017, Rios and Carpou had a confidential discussion about what would constitute a good first offer, which reflects negotiation strategy, should Truinject receive an offer. Truinject never received an offer.

448. Following that confidential discussion, Carpou emailed Rios acknowledging the nature of what was discussed stating "$150m is a good first offer…….(yes, I know confidential)." To confirm that the information was not to be shared, Rios responded by reiterating that the numbers discussed were "super confidential."  The subject of the email containing the confidential information was titled "Re: Lynn Salo".

**D.     William Carpou Disclosed the Protected Confidential Information Conveyed in Confidence with a Mutual Understanding That the Confidence be Maintained**

449. Carpou shared and published this confidential information to other note holders, including Peterson.

450. Between 25 March 2019 and 27 March 2019, the "Re: Lynn Salo" email was opened, published and shared by Carpou at a minimum of 3 times, with persons in Costa Mesa, San Clemente and Laguna Hills, California.

451. Reeves's Orange County Office is located in Costa Mesa, California.

452. On information and belief, Petersons residence is in the zip code, 92674 identified as San Clemente, California.

453. On information and belief, Kovacs residence is in the zip code 92677 identified as Laguna Hills, California.

454. The FAC as filed by Reeves, falsely alleges, "To keep her investors happy, and to promote further infusions of cash, on January 12, 2017, Rios wrote to Carpou stating that Allergan had made an offer to acquire Truinject for at least $150,000,000. Rios intended Carpou to relay this information to other investors, including Plaintiff."

455.   In early-mid 2017, Carpou initiated communications with the Chief Commercial Officer of Allergan regarding Truinject.

456.   Carpou never had the authority to speak on behalf of Truinject.

457.   After finding out about Carpou's conversation with Allergan's Chief Commercial Officer, on or about 18 July 2017 11:49 PM, Rios wrote to both Peterson and Carpou regarding the conversation stating, "I was completely surprised as to how a conversation with Meury went as far as him placing a value on Truinject and sharing this with you.... Any conversation that goes into that kind of extent should be something Truinject is conducting."

### E.   William Carpou Acted on Behalf of OCTANe

458.   Under the respondeat superior doctrine, an employer is vicariously liable for its employees' torts that are committed within the scope of the employment. *See Perry v. County of Fresno* (2013) 215 Cal. App. 4th 94, 101.

459.   "In California, the scope of employment has been interpreted broadly under the respondeat superior doctrine." *Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1004.

460.   Carpou acted as CEO of OCTANe when disclosing confidential information to current note holders, Peterson and the Chief Commercial Officer of Allergan, William Meury.

461.   As a direct and proximate result of the breaches, Truinject has been damaged in an amount to be proven at trial.

462.   Truinject is entitled to recovery of its expenses incurred to enforce its rights under the CDAs and NDAs including, but not limited to, attorney's fees.

463.   The aforementioned acts of Defendants, and each of them, were oppressive, fraudulent, and malicious within the meaning of California Civil Code Section 3294. Defendants' actions were committed with the intent to annoy, harass, and vex Truinject; and they were committed with a willful, wanton and conscious disregard of the rights of Truinject. OCTANe authorized and ratified Carpou's wrongful conduct as alleged herein, and the advance knowledge and conscious disregard, authorization and ratification was on the part of an officer, director or managing agent of OCTANe. Truinject is therefore entitled to an award of exemplary damages against all Defendants according to proof.

**COUNT XV**
**<u>Interference with a Contractual Relationship – Against James Peterson</u>**

464.   Truinject realleges and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

465.   The elements of a cause of action for intentional interference with contractual relations are (1) the existence of a valid contract between the claimant and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. *Redfearn v. Trader Joe's Co.,* 20 Cal. App. 5th 989, 230 Cal. Rptr. 3d 98 (Ct. App. 2018), *as modified on denial of reh'g* (Mar. 16, 2018), *review denied* (May 23, 2018),

466.   Peterson was aware that any and all individuals who were provided with Truinject information, employed by Truinject, Note Holders of Truinject or

88
COMPLAINT

consulted with Truinject were required to sign a Non-Disclosure Agreement or alternatively a Confidential Disclosure Agreement.

**A.** **Interference with Kimberly Kovacs 15 September 2015 Non-Disclosure and 25 September 2016 Confidential Disclosure Agreements with Truinject**

467. Peterson communicated directly with Kovacs both during her employment as Chief Operating Officer for Truinject and after her resignation.

468. Peterson was aware of the contractual and fiduciary relationship between Kovacs and Truinject, by virtue of her status as a Note Holder, Chief Operating Officer and Advisor.

469. As a Note Holder, Peterson also signed a Truinject CDA.

470. Upon information and belief, Peterson solicited information from Kovacs that Peterson knew could only be obtained by breaching the 15 September 2015 NDA and/or the 25 September 2016 CDA.

471. Peterson used the confidential Truinject information obtained from Kovacs' breach as a basis to file meritless fraud charges against Rios in his FAC, filed on 10 January 2019.

472. Solicitation and publication of this information caused a breach of the confidential agreements between Truinject and Kovacs.

**B.** **Interference with William Carpou's 7 October 2016 NDA with Truinject**

473. Peterson communicated directly with Carpou during the time he was a Note Holder and following the Repurchase Agreement.

Complaint(675214.2).docx

474.   Peterson was aware of the contractual relationship between Carpou and Truinject, by virtue of his status as a Note Holder.

475.   As a Note Holder, Peterson also signed a Truinject NDA.

476.   Upon information and belief, Peterson solicited information from Carpou that Peterson knew could only be obtained by breaching the 7 October 2016 NDA between Carpou and Truinject.

477.   Peterson used the confidential Truinject information obtained from Carpou's breach as a basis to file meritless fraud charges against Rios in his FAC, filed on 10 January 2019.

478.   Solicitation and publication of this information caused a breach of the confidential agreements between Truinject and Carpou.

479.   As a direct and proximate result of Peterson's interference with the contracts held between Truinject and Kovacs and Truinject and Carpou, Truinject has been damaged in an amount to be proven at trial.

480.   The aforementioned acts of Defendant were oppressive, fraudulent, and malicious within the meaning of California Civil Code Section 3294. Defendant's actions were committed with the intent to annoy, harass, and vex Truinject; and they were committed with a willful, wanton and conscious disregard of the rights of Truinject. Truinject is therefore entitled to an award of exemplary damages against all Defendants according to proof.

## VI.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

COMPLAINT

Complaint(675214.2).docx

a.      For an award of monetary damages sufficient to fully compensate Plaintiffs for their injuries, in an amount to be determined at trial;

b.      An award of punitive damages in amounts to be determined at trial;

c.      An award of all consequential damages;

d.      An award of all incidental damages;

e.      An order and judgment permanently enjoining Defendants and its officers, directors, agents, servants, employees, affiliates, attorneys, and all others acting in privity or in concert with them, and their parents, subsidiaries, divisions, successors and assigns, from further acts of infringement of Truinject's asserted patents, trade dress, and trade secrets;

f.      A judgment awarding Truinject its actual damages caused by Defendants' trade secret misappropriation under 18 U.S.C. § 1836;

g.      An order finding Defendants' misappropriation is willful and malicious under 18 U.S.C. § 1836;

h.      A judgment awarding Truinject double any damages for trade secret misappropriation under 18 U.S.C. § 1836;

i.      A judgment awarding Truinject its actual damages caused by Defendants' computer fraud under 18 U.S.C. § 1030;

j.      For an award of attorneys' fees and costs as allowed by law;

k.      For interest on all sums awarded; and

l.      For such other relief as the Court deems just and proper.

1

## VII.   <u>JURY DEMAND</u>

2

Plaintiffs requests this case be tried to a jury on all issues triable by a jury

3

under Federal Rule of Civil Procedure 38.

4

DATED this 12th day of January 2021.

5

6

**BEUS GILBERT PLLC**

7

By___*/s/ Megan E. Beus*_____

8

Megan E. Beus

9

K. Reed Willis
701 North 44th Street

10

Phoenix, AZ  85008-6504
Attorneys for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

Complaint(675214.2).docx